## Commonwealth vs. David Young, Jr.

Suffolk. October 6, 1980. — February 3, 1981.

Present: Hennessey, C.J., Quirico, Kaplan, Liacos, & Abrams, JJ.

*Search and Seizure. Constitutional Law*, Search and seizure. *Practice, Criminal*, Location of defendant in courtroom, Directed verdict. *Evidence*, Other offense, Relevancy and materiality. *Homicide.*

Where police officers called after the discovery of the body of an apparent murder victim in the basement of a vacant house followed a trail of scrape marks from the basement to the rear of an adjacent house which also appeared abandoned and found a trail of blood leading from the front of the second house to an apartment on the third floor, the floors and walls of which were wet and bloodstained, the police were warranted by exigent circumstances in entering and moving through the second house and into and through the apartment, making observations and taking evidentiary materials in plain view, as well as taking photographs of the premises and performing certain tests on items therein. [454-460]

Any error in admitting in evidence certain items taken in a warrantless search of an apartment, as well as photographs of the premises and analyses of specimens taken therein, was harmless where the evidence was merely cumulative of other proof. [460-461]

At a criminal trial held prior to this court's decision in *Commonwealth v. Moore*, 379 Mass. 106 (1979), the defendant was not prejudiced by being obliged to sit in the prisoner's dock. [461-462]

At a murder trial, there was no error in admitting evidence of drug dealing between the defendant and one of the victims where the evidence was relevant to establish a possible motive for the killings. [462-463]

At a murder trial, there was no error in admitting in evidence a ballistician's testimony that a gun shown in the defendant's hand in a photograph taken prior to the killings appeared capable of firing the bullets that struck the victims. [463-464]

At a murder trial, there was sufficient evidence to warrant denial of the defendant's motion for directed verdicts of acquittal. [464]

Indictments found and returned in the Superior Court on March 18, 1977.

.

Pretrial motions to suppress evidence were heard by *Dwyer*, J., and *Brogna*, J., and the cases were tried before *Brogna*, J.

After review was sought in the Appeals Court, the Supreme Judicial Court, on its own initiative, ordered direct appellate review.

*Kimberly Homan* (*Norman S. Zalkind* with her) for the defendant.

*Jeremiah Sullivan*, Assistant District Attorney, for the Commonwealth.

KAPLAN, J. Upon indictments for the murders of James ("D.J.") Walker and Lenwood Walker, brothers, in November, 1975, the defendant David Young, Jr., was tried by jury in February, 1979, found guilty of the crimes in the second degree, and sentenced to successive life terms.[1] We review the judgments of conviction which are challenged on several grounds: (1) that certain items secured by the Commonwealth in a search without warrant at the initial discovery of the crimes were erroneously admitted at trial; (2) that the defendant was improperly obliged to sit in prisoner's dock during trial; (3) that evidence of illicit drug dealing by the defendant should have been excluded; (4) that a ballistician's testimony about the photograph of a gun should have been excluded; (5) that motions for directed verdicts of acquittal should have been allowed. We affirm the judgments.

The evidence for the prosecution at trial was in outline as follows. On the morning of November 18, 1975, a body with fractured skull and several bullet wounds was dis-

---

[1] There was a prior trial of the defendant for the murders of the Walker brothers and assault and battery with a deadly weapon on one Anthony Grant. On the latter charge the defendant was convicted and the judgment was affirmed by the Appeals Court. *Commonwealth v. Young*, 6 Mass. App. Ct. 953 (1978). The trial judge declared a mistrial on the murder charges after the jury failed to agree. A different judge presided over the present trial.

covered in the cellar of a vacant single-family house at 14
Jacob Street in the Mattapan neighborhood of Boston. The
victim of what evidently had been a homicide was later
identified as eighteen year old D.J. Walker, and time of
death was fixed by the medical examiner at between
10 A.M. and 10 P.M., November 17. Police upon investiga-
tion followed a trail of scrape marks from the basement of
No. 14 to the rear of the adjacent three-decker house at 10
Jacob Street where it ended in blood and brain matter. Po-
lice also found a trail of blood leading from the front of No.
10 to an apartment on the third floor whose floors were wet
and bloodstained. (The course of the police investigation
and the scene in the apartment are dealt with further at
point 1 below.) From the condition of the apartment it
could be inferred that the victim had been assaulted there;
and, taking into consideration the condition of the skull and
body[2] and the trail first mentioned, it was inferable that the
body had been dropped from the back porch of the apart-
ment to the ground and moved or dragged to the cellar.
The second trail was somewhat enigmatic. But on Decem-
ber 4, 1975, the bullet-pierced body of Lenwood Walker,
seventeen years old, in partially decomposed state, wrapped
in a distinctive purple sheet, was found in an open field
which was being treated for rodents. Medical analysis (hin-
dered by the condition of the body) tended to show that
Lenwood had died on or about November 18. Analysis of
the "testable" bullets, .38 caliber, in both bodies established
that they had been fired from the same gun with a "6-left"
rifling system.[3] The type B of the blood found in the apart-
ment fit both Walker brothers. It was abundantly proved
that the defendant occupied the apartment; he paid rent,
albeit intermittently, to one George Legner who owned the

---

[2] The medical examiner indicated that abrasions on the buttocks and
back of the victim were accounted for by dragging the body from the rear
of No. 10 to the cellar of No. 14.

[3] Four of the six bullets recovered from D.J.'s body, and all four bullets
recovered from Lenwood, were in adequate condition for ballistic testing.

building.  (On occasion, apparently, the defendant could
be found at an apartment on Morton Street or another on
Browning Avenue.)

Further, the proof showed that the defendant knew the
Walker brothers well, and that for some two years D.J. had
sold marihuana supplied by the defendant.  Millie Walker,
the brothers' sister, testified that there had been friction
between the defendant and D.J. in these illicit business
dealings; on one occasion the defendant ceased using D.J.
because, he said, "D.J. kept getting ripped off."  Also the
defendant believed the Walker brothers had participated in
a robbery of the apartment at No. 10.  Anthony Grant, who
knew the defendant as well as the brothers, testified that in
fact he and D.J. (but, he said, not Lenwood) had broken in-
to the apartment and robbed it on November 7.

On November 14 Grant appeared at the defendant's
mother's house at 102 Nightingale Street at the defendant's
invitation.  What started as a social evening soon turned ug-
ly.  The defendant led Grant to the basement ostensibly to
look at some sex pictures.  The defendant said he had
"heard that you and Lenny, [and] D.J., broke into my
house."  Brandishing a club or small baseball bat, the
defendant said, "I can't let you go.  If I let you go, you will
go and tell D.J. and Lenwood and they would leave town";
"I want, want to get them, you know."  The defendant
beat Grant with the bat and shot at him with a gun he was
carrying, but missed.[4]  Hearing the commotion the defend-
ant's stepfather intervened.  The defendant with a compan-
ion drove the injured Grant home, threatening en route to
shoot him and drop him at Franklin Park.  Arriving at
Grant's mother's apartment, the defendant told one John
Bowie, present there, "Tony and a couple of his friends had

---

[4] It was for this attack on Grant that the defendant was convicted at the
prior trial (see n.1 above) and sentenced to five to ten years at Massachu-
setts Correctional Institution at Walpole.

Grant had seen the defendant with a .38 caliber large black gun and he
thought that may have been the gun with which he was assaulted.  He
had also seen the defendant with a small silver gun.

broken into my house and I chastised him [Grant] a little bit"; "You better take care of him because I got something to do." The defendant also said (overheard by Grant's mother), "[K]eep Tony away from Mattapan and keep him away from the Walker brothers."

On November 15, Millie Walker saw the defendant in a hallway of her apartment house. He indicated he knew about her brothers' part in the robbery and asked where D.J. was. When Millie said she did not know, the defendant threatened her with a knife and said she should tell D.J. he was looking for him. That afternoon Millie and D.J. went to see the defendant. For a half hour or so there was a private conversation between D.J. and the defendant. The defendant, who was carrying a gun,[5] said in Millie's hearing that he could use some help in moving some of his things out of the apartment at No. 10 the coming Monday, November 17.

On November 17, the defendant telephoned the Walkers three times at their mother's house at 160 Westview Street, Dorchester. The mother answered the phone and recognized the defendant's voice. She said D.J. spoke with the defendant twice, at noon and 2 P.M., after which D.J. woke Lenwood, told him to shower, and said, "We have to go out later." About 3 P.M. the mother took the third call. The defendant said D.J. had agreed to help him move a couple of doors down from where he was living. D.J. got on the phone and then said to Lenwood, "Come on, man. Let's go help David move and get this man off my back." The brothers left. They did not return.

Sterling Garrison, an acquaintance of the defendant who boarded once or twice a week at the No. 10 apartment, testified that he dropped in at the defendant's mother's house around 2 or 3 P.M. on November 17. The defendant was there. He said "he had found out who had broken into his house [a]nd that they were supposed to be coming by the

---

[5] It was a silver gun with a brown handle. Millie Walker had also seen the defendant with a small black gun.

house, his house and later"; if Garrison "didn't want to get into any trouble" he "should leave" because "he [the defendant] was going to get them." The defendant was carrying a gun.

Despite the defendant's words, Garrison appeared at No. 10 about 10 P.M. (Earlier that evening he had looked for the defendant at the defendant's mother's house.) The door to the apartment was open and from the threshold he could see blood up and down the hall and a body on the living room floor. He did not recognize the body.[6] He entered and, avoiding the body, walked to the middle bedroom, grabbed the clothing he kept there and made a bundle of it with a purple sheet from the bed, and left with the bundle. There was testimony that the sheet in which Lenwood's corpse was wrapped was similar to the sheet used by Garrison.[7]

The police, after the investigation on November 18, promptly began a search for the defendant, but he had dropped from view and was not caught up with until a year later. He was then finally apprehended a floor above his mother's apartment crouched in a closet, wearing disguise.

For the defense, the defendant's mother was the principal witness; the defendant was not called. She said the defendant, except for a brief interval, was at her apartment all day through midnight of November 17, then she went to bed, and she had breakfast with him the next morning, November 18. But when questioned by the police on November 20, 1975, she said, according to police testimony, that she had last seen the defendant at 7 A.M. on November 17. The other defense witness, an assistant clerk of the Boston Municipal Court, produced a court record indicating that D.J.

---

[6] The body, according to Garrison, wore red shoes, and there was testimony by Mrs. Walker that D.J. was wearing shoes of that color the afternoon of November 17. The body in the cellar wore such shoes. Garrison was not acquainted with the Walker brothers.

[7] The police approached Garrison on November 19. A benzidine test performed on Garrison's shoes was negative. Garrison led the police to his cousin's place where he had left the bundle in the purple sheet.

might have appeared in court some time on November 17, which would put in question his mother's account of both brothers being at home when the telephone calls were received. On rebuttal his mother said D.J. had gone out early that morning, about 8:30, returned about 10:45, and had gone back to bed.

1. *Admission of evidence secured at initial investigation and search.* By motion and renewed motion the defendant sought on constitutional grounds to suppress items of evidence arising from the police investigation carried on without warrant at No. 10 on the morning of November 18. The trial judges on voir dire denied the motions over objection and entered findings.[8] The effective errors claimed are in the admission of certain of these items at trial.

(a) We outline the course of the investigation as elicited at voir dire. About 8:25 A.M., November 18, Officers Eugene J. Murphy and Daniel Duran were called to the cellar of No. 14. A gas company employee had discovered a dead body there. The officers asked for help, which arrived about 9 A.M. and later in some strength, including chemists, a fingerprint expert, and a photographer, for it could be assumed there had been a homicide and various kinds of evidence would have to be assembled and recorded. Attention was first centered on the cellar of No. 14. Around 9:30 or 9:45 A.M., Officer John McManus observed marks and stains near and on No. 10, which like No. 14 appeared abandoned. Barking sounds could be heard from within the building. Officers recruited from the cellar followed scrape marks and blood from the cellar at No. 14 to a termination point below the rear porches of No. 10. On another tack, officers, joined by an animal rescue attendant, found red stains on the sidewalk and entryway floor of No. 10. This trail took them, perhaps about 10 A.M.,

---

[8] The parties let stand the record made on the voir dire before the first trial, to which was added further evidence received on voir dire before the second trial. The second judge accepted (with a correction) the findings of the judge on first voir dire and added findings of his own.

through the open door of the house, up the stairs, past the entrances, with open doors, of unoccupied first and second floor apartments, to the third floor landing. The numerous stains on the way were dry, but the officers noted that an effort had been made to rub them out. Facing the third floor apartment, the officers saw a door off its hinges standing upright against the door jamb, partially blocking entrance. The barking dog was within, and the trail led there. Entering the apartment without hesitation, the officers pushed at the door, which fell inward. The attendant set a snare to catch the dog moving in the apartment. At this moment a man came forward from one of the rooms and took the dog in hand. The man, one John Diaz, was held in police custody.

Sergeant John Maillet, walking down the apartment hallway, looked into the kitchen, bathroom, pantry, and rear bedroom. The floors of the hallway and some of the rooms were wet, as if recently mopped.[9] In the pantry were a pail of water, a wet mop, and broom. The benzidine test, applied to the wet surfaces of the floors and to the pail and mop, proved blood (later analyzed as type B).

Maillet, on entering the rear bedroom, saw a bed, a bureau, and a closet with some clothing. An open wooden box on the floor contained a holster and some papers and pictures. Returning to the kitchen with the holster and some envelopes and pictures from the box, Maillet showed the pictures to Diaz. Diaz identified a man in the pictures, by name, as the defendant. (Diaz had explained his own presence in the apartment[10] and his clothes had been tested for

---

[9] It appeared from testimony at trial that the steam off a large tub of water simmering on a range in the kitchen may have prevented or postponed the drying of the floors. It is also suggested that it could make more difficult the recovery of fingerprints.

[10] Diaz said the defendant allowed him to board in the apartment for a small sum. On the morning of November 18, about 6 A.M., he entered the apartment through a porch window, as he had no key. He went to sleep without observing anything unusual. There was not much light. He was awakened by the entrance of the police, who told him he was under arrest. He was released that day.

blood with negative result.) While talking to Diaz, Maillet noticed red stains under the kitchen table and on a refrigerator, the latter in front of a rear door to the apartment. The door jamb was bloodstained. Maillet opened the door and walked down a short hallway leading to another door which opened to the back porch. Items in the hallway were bloodstained.

After Maillet's inspection, officers spent between one and two hours taking samples of the wet patches and of the floors and other solids, and also taking photographs of the interior of the apartment and the bloodstains in and near the building.

(b) The defendant moved "to suppress . . . all physical or testimonial evidence and any fruits thereof seized from 10 Jacob Street, Mattapan, on or about November 18, 1975." We take the judges by their findings to have held that an exigency existed which justified the police in entering and moving through the building and into and through the apartment, making observations and taking evidential materials within the sense of the rule of "plain view." And the judges believed that, within reason, the observations could be memorialized by photographs on the spot and tests could similarly be made. We agree with the judges in the principles they considered applicable.

Exigencies which may justify a procedure without warrant are a narrow category and must be established by the Commonwealth which bears the burden of proof.[11] But whether an exigency existed, and whether the response of the police was reasonable and therefore lawful, are matters to be evaluated in relation to the scene as it could appear to the officers at the time, not as it may seem to a scholar after the event with the benefit of leisured retrospective analysis.[12] In the present case a brutal murder evidently

---

[11] See *Selectmen of Framingham* v. *Municipal Court of the City of Boston*, 373 Mass. 783, 785 (1977); *Commonwealth* v. *Saia*, 372 Mass. 53, 56 (1977); *Commonwealth* v. *Antobenedetto*, 366 Mass. 51, 57 (1974).

[12] See *Commonwealth* v. *Forde*, 367 Mass. 798, 802-803 (1975); *Root* v. *Gauper*, 438 F.2d 361, 365 (8th Cir. 1971).

had been committed on an as yet unidentified person, and there were persuasive signs that the crime was linked to the seemingly abandoned building nearby. Perhaps foremost in the minds of the officers at the threshold of No. 10 was the possibility that there was some other person in that building, injured and requiring aid. Also in their minds would be the chance that a suspect was lurking there. The judges found that both motives or purposes were operative. As the Court said in *Mincey* v. *Arizona*, 437 U.S. 385, 392 (1978), "[W]hen the police come upon the scene of a homicide they may make a prompt warrantless search of the area to see if there are other victims or if a killer is still on the premises."[13] See *Commonwealth* v. *LeBlanc*, 373 Mass. 478, 483-487 (1977); *Wayne* v. *United States*, 318 F.2d 205, 211-212 (D.C. Cir.), cert. denied, 375 U.S. 860 (1963); *State* v. *Johnson*, 413 A.2d 931, 933 (Me. 1980).

So the officers had the right — indeed a practical duty — to pass through the open door of No. 10 and, following the trail and heading toward the sounds of the barking dog, to mount the stairs, reach the apartment on the third floor,[14] and enter it. They encountered immediately the obvious site of a struggle or worse, and an individual who might be the very suspect. The right, after holding the individual, to go through the hallway and rooms of the apartment and make observations, was within the natural boundaries of the exigency. See *Commonwealth* v. *Bowden*, 379 Mass. 472, 478 (1980); *Commonwealth* v. *Walker*, 370 Mass. 548, 556-558, cert. denied, 429 U.S. 943 (1976); *United States* v. *Barone*, 330 F.2d 543, 544-545 (2d Cir.), cert. denied, 377 U.S. 1004 (1964); *People* v. *Lovitz*, 39 Ill. App. 3d 624, 629-630 (1976), cert. denied, 434 U.S. 842 (1977);

---

[13] The *Mincey* case held excessive a four-day intensive warrantless search under a purported "murder scene exception" created by the Arizona court.

[14] It may be noted that the defendant could have no "expectation of privacy," see *Rakas* v. *Illinois*, 439 U.S. 128, 142-148 (1978), in the yard outside or the inner stairway of No. 10. See *Commonwealth* v. *Hall*, 366 Mass. 790, 794-795 (1975).

Mascolo, The Emergency Doctrine Exception to the War-
rant Requirement under the Fourth Amendment, 22 Buf-
falo L. Rev. 419 (1972).

Their entry being lawful, here by reason of exigency, the
police, in accordance with the rule of "plain view,"[15] could
take into their possession material having apparent eviden-
tial connection to the criminal activity they were in course
of investigating.  The Court in *Mincey* v. *Arizona, supra,*
went on to say (at 393), "And the police may seize any evi-
dence that is in plain view during the course of their legiti-
mate emergency activities."  See *Commonwealth* v. *Mee-
han,* 377 Mass. 552, 559-560 (1979), cert. dismissed, 445 U.S.
39 (1980); *Commonwealth* v. *Bond,* 375 Mass. 201, 206-210
(1978); *Coolidge* v. *New Hampshire,* 403 U.S. 443, 465-466
(1971).  Thus the officers could take bloodstained materials
or other items in sight that seemed to be linked to the known
homicide or to a possible further crime foreshadowed by the
separate trail from the front of No. 10. With respect to ma-
terials taken from the open box, the import of the judges'
findings is that surface observation of the nature of the col-
lection would indicate that here might be evidence as to
who lived in or controlled the apartment and therefore evi-
dence, direct or mediate, as to the identity of a witness to or
likely participant in the crime, or a victim of it.  On a simi-
lar basis, envelopes, personal books of telephone numbers,
notebooks, utility bills, and photographs, noticed in the
course of otherwise lawful searches, have been held prop-
erly taken in "plain view," as in *Commonwealth* v. *Lee,* 2
Mass. App. Ct. 700, 702-703 (1974); *Commonwealth* v.
*Fields,* 2 Mass. App. Ct. 679, 681-683 (1974); *United States*
v. *Phillips,* 593 F.2d 553, 556-558 (4th Cir. 1978), cert. de-
nied, 441 U.S. 947 (1979); *People* v. *Hill,* 12 Cal. 3d 731,
756-757 (1974); *Herrera* v. *State,* 561 S.W.2d 175, 177-179
(Tex. Ct. Crim. App. 1978) (en banc).  Although the point
perhaps need not be stressed here, once an item or collection

---

[15] See our recent exposition in *Commonwealth* v. *Cefalo,* 381 Mass.
319, 324-332 & n.9 (1980).

is observed whose general character plausibly indicates evidential relevance, an officer may approach more closely (but short of a material additional intrusion) to note some details and on that basis to make a selective seizure. See *United States* v. *Sheard*, 473 F.2d 139, 144 (D.C. Cir. 1972), cert. denied, 412 U.S. 943 (1973); *United States* v. *Thweatt*, 433 F.2d 1226, 1230-1232 (D.C. Cir. 1970); *United States* v. *Catanzaro*, 282 F. Supp. 68, 69-70 (S.D.N.Y. 1968) (Weinfeld, J.); *State* v. *Streitz*, 258 N.W.2d 768, 773-774 (Minn. 1977). Contrast *United States* v. *Scios*, 590 F.2d 956 (D.C. Cir. 1978) (en banc); *United States* v. *Jackson*, 576 F.2d 749 (8th Cir.), cert. denied, 439 U.S. 858 (1978). See generally 2 W. LaFave, Search and Seizure § 6.7, at 482 (1978); 1 W. Ringel, Searches and Seizures, Arrests and Confessions § 6.5(a)(1), at 6-19 (1979). In the instant case we have no intrusion on closed drawers, or locked suitcases, or the like, and the findings deny specifically that there was any general exploratory search forbidden by the Constitution.

The judges considered the picture taking by the police as merely the recording of observations otherwise provable by testimony apt to be somewhat less accurate (see *Patrick* v. *State*, 227 A.2d 486, 488-490 [Del. 1967]; *State* v. *Epperson*, 571 S.W.2d 260, 265-266 [Mo. 1978] [en banc], cert. denied, 442 U.S. 909 [1979]; *State* v. *Johnson*, 413 A.2d 931, 933-934 [Me. 1980]), and the tests made on the premises, in some cases at least, as needing to be made on the spot, and in any event not unreasonably made there. See *United States* v. *Green*, 474 F.2d 1385, 1389-1390 (5th Cir.), cert. denied, 414 U.S. 829 (1973). See also *United States* v. *Brand*, 556 F.2d 1312, 1317 (5th Cir. 1977), cert. denied, 434 U.S. 1063 (1978); *United States* v. *Herndon*, 390 F. Supp. 1017, 1021-1022 (S.D. Fla. 1975), aff'd, 536 F.2d 1027 (5th Cir. 1976).

The defendant says that at some point after the apartment was entered it could have been secured, the police operation suspended, and a warrant obtained to authorize further exploration. When the feasible point for such disen-

gagement was putatively reached, is not made clear; as the findings indicate, some of the subjects of observation and test, such as the liquid on the floors, would not be available indefinitely. But anyway we think the suggested procedure would have served no particular purpose in the circumstances, and was not obligatory.[16] And that such a step might have been feasible, or even preferable in the long run, does not of itself condemn the reasonable procedure that was in fact followed. See *Commonwealth* v. *Forde*, 367 Mass. 798, 802-803 (1975).

(c) We add that error by the officers, if there was any, would amount merely to nominal error, harmless beyond a reasonable doubt. See *Commonwealth* v. *LaBriola*, 370 Mass. 366, 368 (1976); *Commonwealth* v. *Appleby*, 358 Mass. 407, 414 (1970). We look to the items of evidence in question which were actually received at trial, and consider how much turned on them. There were two pictures of the interior of the apartment, one of the kitchen refrigerator, the other of the rear hall and porch, both pictures showing bloodstains. Also admitted were two bloodstained pieces of flooring from the apartment, and other bloodstained specimens from the back porch, together with an analysis of these things and the results of other tests made in the apartment. If all this evidence were held inadmissible on the theory, e.g., that a warrant should have preceded picture taking, collection of specimens, and testing, the oral testimony by witnesses about the physical conditions would remain, and also the results of the tests for blood carried out on stains at places outside the third floor apartment, including the sidewalk and stairs of No. 10.

The situation with respect to the material taken from the open box is just as clear. Admitted in evidence were seven envelopes and two phone bills addressed to the defendant (at locations other than No. 10), the holster, a photograph

---

[16] The officers' stay in the apartment was continuous and not excessive. It compares favorably with the night and morning stays for investigative purposes in a fire gutted building which were held reasonable in *Michigan* v. *Tyler*, 436 U.S. 499, 510-511 (1978).

of the defendant and his nephew both holding guns, and a half dozen other pictures, one showing D.J. with a gun, one showing the defendant with a gun, one of the defendant holding an object that may be a cigarette lighter, two showing the defendant and companions, and one of the defendant alone. All these tended in some measure to prove that the defendant lived at the apartment, but that was established through the witnesses Grant, Garrison, Diaz, and Legner, as indicated above, to whom may be added Millie Walker and the defendant's mother. Some of the items — pictures and holster — tended to prove that the defendant had access to a variety of guns, but that was proved through the witnesses Grant, Millie Walker, and Garrison, as noted above, and we may add the defendant's mother. The picture showing D.J. tended to prove that the defendant and D.J. were acquainted, but that was well agreed. Thus the items in question were merely cumulative upon other proof. (The picture of the defendant and nephew is dealt with again at point 4 below.)

2. *Defendant in the dock.* At trial the defendant was denied a motion to be seated with his counsel and was relegated to the dock. This, he claims, impaired the presumption of his innocence. But at the date of trial we had not modified our rejection of such a contention and had left seating arrangements to the trial judge. See *Commonwealth* v. *Walker*, 370 Mass. 548, 573-574, cert. denied, 429 U.S. 943 (1976); *Commonwealth* v. *MacDonald (No. 2)*, 368 Mass. 403, 408-409 (1975).

It is true that in *Commonwealth* v. *Moore*, 379 Mass. 106, 107-111 (1979), considering approvingly *Walker* v. *Butterworth*, 599 F.2d 1074, 1080-1081 (1st Cir.), cert. denied, 444 U.S. 937 (1979) (rev'g on other grounds, 457 F. Supp. 1233 [D. Mass. 1978]), we held that a defendant's request to sit with his counsel should be allowed unless valid reasons of security, spread on the record, otherwise required. However, this rule was to apply "[f]or the future." 379 Mass. at 111. The present case is not covered. See *Commonwealth* v. *Guy*, 9 Mass. App. Ct. 318 (1980).

The defendant argues nevertheless that there was error, first, because the *Butterworth* case had been decided at the District Court level when the present case was tried, and its reasoning (457 F. Supp. at 1238-1239) was urged upon the trial judge; second, because the refusal to follow the District Court's reasoning was particularly damaging, as only the identity of the murderer, not the fact of the murders, was open to any doubt, and on that question appearances might have had an important influence. We acknowledge that the trial judge might have done better to set out his appraisal of the circumstances of the case before him, which included an affidavit of counsel about the defendant's record of past behavior. But his failure to do so does not suggest a reversal of the convictions. The District Court opinion in *Butterworth* states that "petitioner's discretionary segregation in the dock neither diluted his presumption of innocence nor denied him a fair and impartial trial" (at 1239). And in *Moore,* while we recognized that the casual use of the dock was unwise, this was not because the practice always or even usually operated to the defendant's prejudice, but rather because there was no good reason in appropriate cases to risk even a very remote possibility of hurting a defendant's chances. In *Moore* itself no prejudice was shown to justify reversal. In the instant case the judge gave clear instructions on the presumption of innocence and the manner of approaching the evidence in the case. The dock was not mentioned, but the defendant had not requested an instruction on the subject. "[N]ot every incident or circumstance which focuses the jury's attention on the fact that the defendants are the persons on trial can be considered to invade constitutional rights." *Commonwealth* v. *Campbell,* 378 Mass. 680, 697 n.14 (1979).

3. *Admission of evidence of drug dealing.* Relevant evidence is not rendered inadmissible merely because it indicates that the defendant may have committed an offense other than that for which he is being tried. See *Commonwealth* v. *Monsen,* 377 Mass. 245, 252 (1979); *Commonwealth* v. *Hoffer,* 375 Mass. 369, 372 (1978). Yet there is

ground for excluding such evidence if the prejudice likely to be generated by it outweighs its probative value — a matter on which the opinion of the trial judge will be accepted on review except for palpable error. See *Commonwealth* v. *Chalifoux*, 362 Mass. 811, 815-816 (1973).

There was objection to testimony by Anthony Grant and Millie Walker about drug dealing between the defendant and D.J., more specifically about D.J.'s being "ripped off," which could lead the defendant to believe that D.J. was shortchanging him in accounting for sales of drugs. The testimony was relevant as supplying a possible motive for the defendant's taking violent action against D.J., and the relevance is not diminished because there may have been another and perhaps more potent motive deriving from the break-in at the apartment. We cannot say that the judge erred in admitting the testimony. It was well for the jury to have a view of the entire relationship between the defendant and one of the alleged victims. The drug trafficking was not dwelt upon in undue detail calculated to put pressure on the jury, and the judge's instructions advised the jury to adopt a dispassionate attitude toward the proofs.

4. *Admission of ballistician's testimony.* Officer William J. Murphy, a ballistician of the Boston police department, testified for the prosecution that the testable bullets that struck the victims were all .38 caliber and fired from the same weapon having a "6-left" rifling system. (He testified also that the .38 caliber bullets fired past Anthony Grant, and recovered in the cellar of the defendant's mother's house, did not come from that weapon.) Murphy was shown the photograph from the open box in the third floor apartment which showed the defendant and his four or five year old nephew each holding a gun. Murphy said the gun in the defendant's hand was probably a Colt whose appearance was "consistent with" that of a gun that could have fired the bullets that struck the victims. Because there were a multitude of guns in existence, of various makes and characteristics, that looked like the photographed gun, some of which could, and others of which could not, have delivered

those bullets, Murphy's testimony on this point was only marginally probative, as a voir dire had indicated, and the judge might have been better advised to exclude it. However, an able cross-examination demonstrated the weakness of the testimony, and we think the defendant was, if anything, helped rather than prejudiced by it. By the same token, if there was error in failing to suppress this photograph, the error was harmless.

5. *Denial of directed verdicts of acquittal.* Applying the standard of *Commonwealth* v. *Latimore,* 378 Mass. 671, 676-679 (1979), to the application herein for directed verdicts of acquittal, we judge the denial to have been correct. Motive and intention were shown, as well as the likely availability of means. Then we have the victims invited to the fatal place and physical evidence pointing to the fact and manner of the assault on them there. A quantum of proof is added by the defendant's submergence or disappearance for a year to avoid capture. As we have said recently, "That the case against [the defendant] was 'circumstantial' in some sense of that dubious term does not suggest that the proof was insufficient. . . . A web of convincing proof can be made up of inferences that are probable, not necessary." *Commonwealth* v. *Best,* 381 Mass. 472, 483 (1980).

Upon a review of the record pursuant to G. L. c. 278, § 33E (see *Commonwealth* v. *Davis,* 380 Mass. 1, 17 [1980]), we find no basis for mitigation of the verdicts or for a new trial.

*Judgments affirmed.*