Whitehead, J.
Background
The defendants stand indicted for the crimes of trafficking in 200 grams or more of cocaine, and conspiring to traffic in 200 grams or more of cocaine. Each of them filed a motion to suppress physical evidence which was allegedly seized by the Lynn Police from the third-floor apartment at 102 Cottage Street, in Lynn, on October 30,1994. Each moved to suppress all statements made by him on that date. The Court held a hearing on the motions on October 15, 1995-October 16, 1995. On October 16, 1995, the Court allowed the motions in part and denied them in part. At that time, the Court dictated into the record the essence of its findings of fact and rulings of law. By way of this document, the Court now reduces those findings and rulings to writing.
Findings of Fact
On the evening of October 30, 1994, Lynn Police Officers Shawn Hogan and Charles Griffin were on uniformed patrol in a police cruiser. At approximately *144 8:11 p.m., they received a direction from their dispatcher to proceed to 102 Cottage Street in response to a report of a disturbance on the second floor.[1]
The officers arrived at 102 Cottage Street within approximately one minute of receiving the call. Upon their arrival, they observed no apparent disturbance outside. They then proceeded up the steps to the front door and opened the outer door. They were unable to open an inner door because it was locked. They rang the doorbell of the first-floor apartment and, after a minute or so, a couple came to the door. The couple opened the inner door and stepped back, thereby allowing the officers entry.
The officers indicated to the couple that they had received a call for a problem on the second floor, and they asked the couple if they were aware of the problem. The couple pointed to the second floor and said words to the effect, “The problem is on the second floor.”
During their encounter with the couple, the officers observed that neither of the couple appeared to be suffering from any injury. In addition, the couple had left the entrance to their apartment open, with the result that the officers could see inside of the apartment. There did not appear to be any evidence of a disturbance inside of the apartment. At that point, the officers proceeded up the stairs.
The building at 102 Cottage Street consists of a three-stoiy, three-family, wooden structure. There is one apartment located on each floor. As has been previously noted, there is a front entrance which contains two doors, an outer door and an inner door. The doors are only inches apart. The front entrance enters into a staircase which serves all three apartments on their respective floors. There is also a rear staircase which serves all three apartments and the basement. Entrance to the rear staircase from outdoors can be had through a first-floor door which, on October 30, 1994, was unlocked.
The stairway upon which Officers Hogan and Griffin proceeded on October 30, 1994, was the front stairway. When they arrived at the second-floor landing, they observed that the door to the apartment on the second-floor was open and that the portion of the apartment nearest to the front door was dark. The officers thereupon entered the apartment for the purpose of determining whether or not anyone had suffered injuiy inside. As they searched the apartment, using flashlights, they observed it to be sparsely furnished. The furniture consisted, primarily, of a chair, a television set and a VCR.
At some point during their search of the second-floor apartment, the officers observed that the rear door was damaged — the door frame was broken and a portion of the door appeared to be chipped. The door gave the appearance of having been forcibly opened at some point in time.
While Officer Hogan remained inside of the second-floor apartment, Officer Griffin left the apartment and proceeded up onto the third-floor. He went by way of the front staircase. He knocked on the door of the third-floor apartment and said, first, “Lynn Police,” and then “Lynn Policia.” After some period of time, he heard footsteps proceeding quickly away from the front door. They sounded like the footsteps of more than one person.
Officer Hogan, from the second-floor apartment, heard the same footsteps, and he entered onto the rear staircase by way of the rear door to the second-floor apartment. As he did so, he heard a door upstairs open and then close. He did not see anyone on the staircase at that time. He continued up the stairs to the third-floor landing and stood immediately outside of the rear door to the third-floor apartment.
After he had stood there for a period of seconds, the rear door opened. Standing in the doorway was the defendant Castillo. Officer Hogan could see beyond the doorway, into the apartment (the lighting was good). He observed a bathroom immediately to the right and approximately four feet away from him; he saw a kitchen beyond that.
Castillo backed away from the doorway and towards the kitchen. At that point, Officer Hogan observed a man — later identified as Jesus Rodriguez — bent over the toilet in the bathroom. Rodriguez was manipulating the toilet in such a way that it would flush continually, and he was emptying a white powdery substance from a plastic bag into the toilet. Based upon Officer Hogan’s training and experience, he concluded that the powder contained in the bag likely was cocaine.
At that point, Officer Hogan stepped through the rear doorway, grabbed Mr. Rodriguez, pulled him out of the bathroom and brought him into the kitchen. Once Officer Hogan was inside of the kitchen with Rodriguez, he saw the defendant Morales standing at a kitchen window, a few feet away from the kitchen table. He appeared to be tossing items out of the window, as he looked, alternately, at the officer, the table and the window. As that was happening, the defendant Sanchez was standing immediately adjacent to the table. The defendant Castillo was also nearby.
Officer Hogan called for assistance. Officer Griffin received the call on the radio, while still standing outside of the front door of the third-floor apartment. In response, he proceeded down to the second-floor, went through the second-floor apartment, walked up the rear staircase, and entered the third-floor apartment through the rear door.
Once Officer Hogan and Officer Griffin had linked up, they called for additional back-up. Responding to that call were Officers John Meaney and Henry Wojowodzic, also known as Officer “Wojo.” The backup officers arrived within a minute and entered the building through the unlocked rear outer door. They *145 then proceeded up the rear staircase and entered the third-floor apartment through its rear door.
Officer Hogan and Officer Griffin did not know whether there was anyone inside of the apartment other than the four men in the kitchen, and they were therefore concerned for their own safety. Upon the arrival of Officers Meaney and Wojo, they suggested that Officers Meaney and Wojo conduct a protective sweep of the apartment, and Officers Meaney and Wojo did so.
While the protective sweep was occurring, Officer Hogan remained in the kitchen. During that time, he looked at the kitchen table and observed the following items: a standard package of “Glad-Wrap” baggies; fifty small plastic baggies measuring approximately one-half inch along each side; two scales; and an open paper bag. Looking inside the opening of the paper bag, he observed that it contained additional baggies, which, in turn held a white powder.
Based upon his training and experience, and upon his observations of the items on the table, Officer Hogan concluded that the white powder contained inside of the paper bag was cocaine. He removed the baggies from the paper bag and made further observations, which convinced him that the powder was, in fact, cocaine.
In the meantime, Officer Griffin went outdoors and searched the area underneath the kitchen window. There, he found two bags of white powder which also appeared to be cocaine.
During the protective sweep, Officer Wojo observed, lying in plain view in the living room, a green notebook. It was open, but it was tipped in such a way that only its cover was visible to him. He could not see any notations on the notebook. However, he turned up the notebook and thereby observed that it did contain notations inside, including dollar signs. He then seized the notebook.
Also during the protective sweep, Officer Meaney observed, in a bedroom, a drawer which was partially open. Inside the drawer, he saw a quantity of cash. He could ascertain that there was more than one bill; in fact, there were several bills stacked up. However, the exact amount was not apparent to him. He opened the drawer further and retrieved the cash, the total amount of which was eventually determined to be $2,628.00.
The officers ultimately handcuffed the three defendants and Rodriquez and removed them from the apartment. The men were transported to the police station and booked. At booking, officers recovered from each of them a beeper and a quantify of cash, the amount of cash varying with each man.
The defendants moved to suppress all physical evidence seized by the police on October 30, 1994; and all observations which the police made while in the apartment.[2] By way of its October 16, 1995 order, the Court suppressed only the green notebook and the cash.
Rulings of Law
All of the parties agree that the threshold issue, and for the most part the determinative issue, in this matter is whether Officer Hogan had a right, consistent with constitutional principles, to be standing outside of the rear door to the third-floor apartment when Castillo opened the door and enabled him to observe the interior of the apartment. The Court joins in that view and, ultimately, concludes that Officer Hogan was in a place where, from a constitutional perspective, he was entitled to be.
I. The Question of Whether or Not a “Search” Occurred.
In Massachusetts, a defendant who, as here, is charged with a crime “in which possession of the seized evidence at the time of the contested search is an essential element of guilt,” has automatic standing to challenge the legality of the search. Commonwealth v. Amendola, 406 Mass. 592, 601 (1990). However, the inquiry does not end there. Once automatic standing has been conferred, the separate question is presented, whether a “search” in a constitutional search has taken place. Commonwealth v. Frazier, 410 Mass. 235, 244, fn.3 (1991); Commonwealth v. Montanez, 410 Mass. 290, 301 (1991). The precise question is “whether the police conduct has intruded on a constitutionally protected reasonable expectation of privacy. The measure of the defendant’s expectation of privacy is 1) whether the defendant has manifested a subjective expectation of privacy in the object of the search, and 2) whether society is willing to recognize that expectation as reasonable.” Commonwealth v. Montanez, 410 Mass. at 301. See generally Commonwealth v. Carter, 39 Mass.App.Ct. 439, 441-42 (1995).
The burden is on a defendant who challenges police action to establish that it infringed upon his reasonable expectation of privacy. Commonwealth v. D’Onofrio, 396 Mass. 711, 715 (1986). The defendants have not met that burden here. It is clear that both the front stairway and the back stairway of 102 Cottage Street were common areas of the building. Although the fact that at least the front door was locked warrants the inference that access to the building was limited, access nevertheless was available to the occupants of the first, second and third-floor apartments; to their guests; to the landlord; and, presumably to any service personnel. Moreover, access was further available to anyone else who had the presence of mind to walk around to the rear door, which, as it turns out, was unlocked. Thus, there was a large number of individuals who potentially might have been on the stairways at any given moment.[3]
In light of the ease of access to the third-floor landing and the large number of potential users of the common stairways, the Court concludes that the oc *146 cupants of the third-floor apartment could not have possessed an expectation of privacy which could be deemed objectively reasonable.[4] Moreover, such being the case, Officer Hogan infringed no constitutional prohibition by proceeding to the third-floor landing and standing outside of the third-floor apartment. In short, in undertaking those actions, he conducted no “search.”
The Court has conducted a survey of Massachusetts decisions in this area and has found no case presenting precisely the facts which exist here. However, almost without exception, the decisions which the Court has reviewed have found no constitutional violation when police officers have made observations oi seizures of evidence from common areas. See, e.g., Commonwealth v. Montanez, 410 Mass. 290, 300-03 (1991) (seizure from ceiling of common hallway of apartment building upheld); Sullivan v. District Court of New Hampshire, 384 Mass. 736 (1981) (seizure from hospital canteen upheld); Commonwealth v. Dinnall, 366 Mass. 165, 166-67 (1974) (eavesdropping on conversation from common hallway of apartment building, to which entrance was unlocked, upheld); Commonwealth v. Thomas, 358 Mass. 771, 774-75 (1971) (seizure from common cellar of apartment building upheld); Commonwealth v. Serbagi, 23 Mass.App.Ct. 57 (1986) (observations made from outdoor common grassy area of condominium complex upheld).
The closest factual case of which the Court is aware and in which information acquired by police from a common area was suppressed is Commonwealth v. Hall, 366 Mass. 790, 792-98 (1975). However, there, although the building was a multi-apartment structure, the defendant was its exclusive owner and occupant. Moreover, he had installed a lock and buzzer system at the entrance in order to “exclude members of the public and to admit none but the defendant’s own guests and invitees.” Id at 795. Thus, for constitutional purposes, the whole interior of the building was tantamount to the interior of a single-family residence, to which a warrantless police entry, of course, would be impermissible. However, that is not the situation here.
This Court takes heed of the caveat given by the Supreme Judicial Court in Hall, to the effect that the question of whether or not there is a reasonable expectation of privacy in cases such as this “cannot be measured [simply] by classifying ‘apartment hallway’ as either a ‘protected’ or ‘unprotected’ area." Id at 794. The issue is more complex than that. However, here, where the subject landing was exposed to potential use by a relatively broad group of individuals, and particularly where entry to the stairway which led to the landing could be had through an unlocked exterior door, this Court has concluded that no reasonable expectation of privacy existed.
II. The Issue of Consent.
Even if a reasonable expectation of privacy had existed, such that the action of Officer Hogan in standing on the landing constituted a “search” for constitutional purposes, it was a permissible search. The Commonwealth seeks to justify such a “search” on two grounds. First, it contends that the officers had consent to proceed through the common areas from the couple whom they had encountered when they first arrived at the building. Second, the Commonwealth asserts that a search was justified by application of the “emergency exception” to the search warrant requirement. The Court disagrees with the first contention, but agrees with the second one.
“Police may not make a warrantless entry into the home of a third person to arrest a suspect or to search for or seize evidence, absent exigent circumstances or consent.” Commonwealth v. Derosia, 402 Mass. 284, 286, cert. denied, 488 U.S. 980 (1988). Consent to search may be given by one who actually has authority to give such consent or by one who reasonably appears to have such authority. Illinois v. Rodriguez, 497 U.S. 177 (1990). When consent is the basis for a warrantless entry, that consent must be “consent unfettered by coercion, express or implied, and also something more than mere ‘acquiescence to a claim of lawful authority.’ ” Commonwealth v. Walker, 370 Mass. 548, 555, cert. denied, 429 U.S. 943 (1976), quoting Bumper v. North Carolina, 391 U.S. 543, 549 (1968). The voluntariness of an individual’s consent is a question of fact, to be decided on all the circumstances. See Commonwealth v. Maloney, 399 Mass. 785, 787 (1987). The burden ultimately is on the Government to establish the fact of voluntary consent. Schneckloth v. Bustamonte, 412 U.S. 218, 248 (1973).
The evidence in this case does not establish who the couple on the first floor actually were. However, it reasonably appeared to the officers that the couple were the occupants of the first-floor apartment. Presumably, if they were the first-floor occupants, they would have had authority to consent to having the officers traverse the common hallways of the building.
But did the couple actually give such consent? On that point, the evidence is ambiguous. In the end, as the officers themselves testified, consent was really not an issue with them. They were responding to what they believed was an emergency call. As they further acknowledged, they did not ask for consent; the couple did not explicitly give consent.
The Court concludes that the acknowledgment by the couple that there was “a problem,” and their pointing upstairs to indicate where the problem was, cannot be said to constitute voluntary consent to search. At best, the evidence establishes “mere acquiescence to a claim of lawful authority.”[5]
*147 III. Application of the Emergency Exception.
However, the circumstances do present a case for application of the “emergency exception” to the search warrant requirement. “The right of the police to enter and investigate in an emergency without the accompanying intent to either search or arrest is inherent in the very nature of their duties as peace officers, and derives from the common law.” United States v. Barone, 330 F.2d 543, 544 (2nd Cir. 1964), cert. denied, 377 U.S. 1004 (1964) (citations omitted). “(P)olice officers may enter a dwelling without a warrant to render emergency aid and assistance to a person whom they reasonably believe to be in distress and in need of [their] assistance.” Root v. Gauper, 438 F.2d 361, 364 (8th Cir., 1971). “And the police may seize any evidence that is in plain view during the course of their legitimate emergency activities.” Mincey v. Arizona, 437 U.S. 385, 393 (1978) (citations omitted).
The “emergency exception” to the warrant requirement has been applied to a host of situations in jurisdictions across the country. See, e.g., Michigan v. Tyler, 436 U.S. 499 (1978) (upholding seizure of evidence of arson during repeated warrantless entries by fire investigators, made close in time to fire, for purpose of determining origin of fire); United States v. Zurosky, 614 F.2d 779 (1st Cir., 1979), cert. denied, 446 U.S. 967 (1980) (upholding warrantless entry into warehouse by police to investigate apparent break-in-progress); United States v. Barone, supra (upholding seizure of counterfeit money during warrantless entry by police into rooming house for purpose of investigating reason for woman’s screams); Wayne v. United States, 318 F.2d 205 (D.C. Cir. 1993), cert. denied, 375 U.S. 860 (1963) (upholding seizure of dead body by police after warrantless entry into apartment to investigate report of “unconscious woman”); Commonwealth v. Marchione, 384 Mass. 8 (1981) (seizure of explosive material by police after warrantless entry based upon report of existence and location of such material); Commonwealth v. Kingsbury, 7 Mass.App.Ct. 51, 52-54, (1979), aff'd, 378 Mass. 751 (1979) (upholding seizure of evidence by police after warrantless entry into apartment for purpose of investigating moaning sounds). See also Mincey v. Arizona, supra at 392 and cases cited. See generally, Lafave, “Search and Seizure,” s. 6.6 (1987).
As our Appeals Court has noted, when the Commonwealth invokes the “emergency exception” to the warrant requirement, the burden rests on it to show that the circumstances lie within the scope of that exception. Commonwealth v. Bates, 28 Mass.App.Ct. 217, 219-20 (1990). However, what is constitutionally sufficient to justify a search in the context of an emergency is less stringent than what is sufficient to justify a search for evidence of a crime. The test is not whether there was probable cause to believe that an emergency existed, but rather, whether there were reasonable grounds to believe that an emergency existed. Id. “Police action [in this context] is to be viewed under [the] reasonableness standard in light of the circumstances in the field, not by ‘Monday morning quarter backing.’ ” Commonwealth v. DiGeronimo, 38 Mass.App.Ct. 714, 723 (1995) (footnote omitted).
Generally, in the law of search and seizure, the reasonableness of a search is determined by weighing the level of suspicion justifying the search, against the degree of intrusion effected by the search. See Camara v. Municipal Court of San Francisco, 387 U.S. 523, 536-37 (1967) (there is “no ready test for determining reasonableness other than by balancing the need to search against the invasion which the search entails”). Thus, for example, an investigative detention and ensuing pat-down need only be justified by a reasonable and articulable suspicion; however, an arrest and full-blown search incident thereto requires probable cause. A rule of proportionality is applied. See generally Commonwealth v. Borges, 395 Mass. 788, 793-94 (1985).
In assessing the reasonableness of an emergency search, then, it appears appropriate to weigh, on the one hand, the nature of the emergency believed to exist and the basis for believing it exists; and, on the other hand, the scope of the police intrusion undertaken in order to investigate the emergency. See generally, Commonwealth v. Marchione, 384 Mass. 8, 9-11 (1981); Commonwealth v. Young, 382 Mass. 448, 458 (1981). Applying such a rule of proportionality to the circumstances of this case, the Court determines the police action to have been reasonable.
The first information which officers Hogan and Griffin acquired on the date in question consisted of a communication from their dispatcher to the effect that a disturbance had been reported at 102 Cottage Street. The dispatcher himself did not testify as to the circumstances of the report which he, himself, had received. Therefore, the reliability of the information that he received cannot be gauged. Consistent with Commonwealth v. Antobenedetto, 366 Mass. 51, 57 (1974), if the dispatch, alone, were what the officers based their actions on, it would not justify much, if any, police intrusion into 102 Cottage Street. However, once the officers arrived at the scene, and after they had been allowed entry inside the front door by the couple on the first floor, they acquired first-hand confirmation from the couple that there was “a problem” on the second-floor.
Thus, the Court, first considers the validity of the officers’ actions at that point. What information did they have? An on-the-scene confirmation that there was a “problem” by apparent occupants of the building. What intrusion did they effect? At that point, all that they did was to proceed up the common front stairway to the second-floor — a de mimimis intrusion, if any at all, upon the privacy interests of the defendants.
*148 While on the second-floor landing, the officers observed that the second-floor apartment door was open; the apartment was dark. That information, coupled with information that there was a “problem,” could reasonably cause them to fear that someone inside of the apartment might be injured. They did draw that conclusion, and they entered the apartment. So far as it appears, this effected no intrusion upon the privacy interests of the defendants, as they make no claim with respect to the second-floor apartment.
Once inside the second-floor apartment, the officers observed that the rear door to the apartment had been damaged, the damage being suggestive of some kind of violence or forcible entry. This reasonably caused them to have even greater suspicion that some sort of violence may have occurred in the building and, there being no one in the second-floor apartment, that an injured party might be located elsewhere in the building.
What intrusion did the officers effect at that point? One proceeded up the front common staircase to the front third-floor landing; the other proceeded up the rear common staircase to the rear third-floor landing. Again, the intrusion upon the privacy interests of the defendants, although perhaps greater than the intrusion effected by walking up to the second-floor landing, was nevertheless minimal.
When the Court balances the minimal intrusion effected by entering the third-floor landing against the nature of the emergency which the officers, at that point, could reasonably have believed to exist namely, that a forcible entry into the second-floor apartment had occurred and that an injured party or the perpetrator himself could still be somewhere in the building the Court concludes that it was reasonable for the officers to proceed to the area outside of the front and rear doors, respectively, of the third-floor apartment. Compare generally Commonwealth v. Cricones, 12 Mass.App.Ct. 952 (1981) (where police responding to call found gunshot victim in house and where bystander “muttered ‘upstairs’ ” to responding officers, search of upstairs area for hidden person was justified under emergency exception). Moreover, such being the case, the observations which the police officers made from those vantage points validly could serve as the basis for future action which they took. See generally, Mincey v. Arizona, supra at 393; Commonwealth v. Young, 382 Mass. 448, 458 (1981).
IV. The Ultimate Validity of the Seizures.
Assuming the lawful authority of Officer Hogan to be on the landing and to make observations therefrom, the defendants, at oral argument, did not dispute his authority to enter the apartment upon observing Rodriguez apparently in the act of flushing cocaine down the toilet; nor did they dispute the officers’ authority to seize the items from the kitchen table, the items found outside of the kitchen window or the items seized from the defendants at booking. The Court concludes that all of those items, as well as the officers’ observations of the defendants’ activities inside the apartment are, subject to application of the traditional evidentiary rules, admissible as evidence.
However, the notebook and the cash must be suppressed. It is true that police officers who make a warrantless entry onto premises based upon exigent circumstances may conduct a “protective sweep” in order to secure themselves against harm from other persons inside. Commonwealth v. Bowden, 379 Mass. 472, 478 (1980). It is also true that they may seize items which are deemed to be in “plain view” as that sweep occurs. Commonwealth v. Acosta, 416 Mass. 279, 283 (1993). However, there is a limitation on that principle. Such items may be seized only if their evidentiary significance is apparent without the police having to take action beyond the scope necessary to secure their safety. See Commonwealth v. Young, supra at 448; Commonwealth v. Cefalo, 38 Mass. 319, 324-32 and n.9 (1980). Here, the evidentiary significance of the notebook was not apparent until Officer Wojo turned it over. He did not have to turn it over as part of his search for other individuals in the apartment. Similarly, the evidentiary significance of the cash was not apparent until Officer Meaney pulled the drawer further open and ascertained that it consisted of an abnormally large sum. He did not have to do that as part of his search for other individuals in the apartment. Therefore, neither item was in “plain view” within the constitutional meaning of that term, and each must be suppressed.
Conclusion
For the reasons stated above, the Court, by way of its order of October 16, 1995, has denied the defendants’ motions to suppress, except as to the notebook and cash, which items are suppressed.

There was conflicting testimony as to whether or not the dispatcher provided other details of the report. Because the Court cannot resolve that conflict, it assumes that no details were provided.

The defendants also moved to suppress all statements made to the police. However, there was no evidence that any statements were made.

It is, of course, true that they would be less likely to be on the third-floor landing than elsewhere, because it was at the top of the stairs; however, the possibility remained that they could be there, either by mistake or out of curiosity.
It is also true that the police were not among those individuals who ordinarily might have been expected to be within the building. However, in the view of the Court, that fact is immaterial. See. e.g., Commonwealth v. Thomas, 358 Mass. 771, 774 (1971) (fact that police entry into common area constituted trespass on their behalf did not vitiate validity of seizure from that area).

The Court also notes that there was no evidence that the defendants possessed any subjective expectation of privacy in the third-floor landing.

Although this discussion takes place under the heading “Rulings of Law,” the ultimate conclusion, as already noted, is one of fact.