COMMONWEALTH *vs.* ALBERT LEWIN (NO. 1).

Suffolk. April 2, 1990. - June 12, 1990.

Present: LIACOS, C.J., WILKINS, LYNCH, O'CONNOR, & GREANEY, JJ.

*Homicide. Constitutional Law*, Search and seizure. *Search and Seizure*, Exigent circumstances.

Discussion of the decisions of the United States Supreme Court that delineate the permissible scope, under the Fourth Amendment, of warrantless searches justified by exigent circumstances. [621-624]

Police officers at a homicide scene lawfully, on the basis of exigent circumstances, conducted a protective warrantless search of a building; however, the exigency ended when the premises had been secured, all suspects and victims had been located, and the defendant had been arrested, with the result that the continuation of the warrantless search of the premises thereafter was unreasonable under the Fourth Amendment to the United States Constitution, and all material then seized was to be suppressed as evidence at the defendant's trial. [624-627]

INDICTMENTS found and returned in the Superior Court Department on May 11, 1988.

A pretrial motion to suppress evidence was heard by *John J. Irwin, Jr.,* J.

An application for an interlocutory appeal was allowed by *O'Connor, J.,* in the Supreme Judicial Court for the county of Suffolk, and the appeal was reported by him.

*Max D. Stern (Patricia Garin* with him) for the defendant.

*Thomas J. Mundy, Jr.,* Assistant District Attorney (*Susan Underwood,* Assistant District Attorney, with him) for the Commonwealth.

GREANEY, J. A single justice of this court allowed the defendant's application for interlocutory review of an order of a judge of the Superior Court which denied the defendant's motion to suppress numerous items seized in a warrantless

search of apartment no. 3 at 104 Bellevue Street, Dorchester.
See Mass. R. Crim. P. 15 (b) (2), 378 Mass. 882 (1979).
The defendant was indicted for murder and other offenses
arising out of the fatal shooting of a Boston police officer
during the execution of a "no-knock" search warrant at the
apartment on February 17, 1988. This particular warrant
was invalid, and the events concerning its issuance, the at-
tempt to execute it, and subsequent proceedings in the case
are described in *Commonwealth* v. *Lewin,* 405 Mass. 566
(1989). The seizures in issue here took place during the night
of February 17, 1988, and are argued by the Commonwealth
to be justified by exigent circumstances arising in the after-
math of a homicide. The judge agreed with the Common-
wealth's argument. We do not agree, and consequently re-
verse the order denying the motion to suppress.

The judge's findings of fact are as follows. At about 8 P.M.
on the evening of February 17, 1988, Boston police officers,
assigned to the drug control unit, attempted to execute a
"no-knock" search warrant at 104 Bellevue Street, apart-
ment no. 3. Among the police officers present were Officers
Sherman Griffiths, Carlos Luna, Hugo Amate, Paul Schroe-
der, and Edward Walsh.

As Officer Griffiths took his turn at the sledgehammer to
break down a metal door to the apartment, a shot was fired
through the door, hitting and killing him. The other officers
called for immediate assistance, and waited on the landing
outside the door to apartment no. 3 until additional police
officers arrived. Shortly after the shooting, a group of officers
entered the building through the rear entrance and went up
the back stairs to the apartment. All of the apartments in the
building had access to the back stairway. From outside the
building, the police could not see people on the stairway.

The officers were able to gain entrance to apartment no. 3
through the back door. Once inside apartment no. 3, the of-
ficers opened the front door to let in the officers on the land-
ing and the assembled force promptly began a protective
sweep of the apartment to look for the assailant or assailants.
No one was found in apartment no. 3. At this time, amidst

great confusion, the police did not know who, if anyone, lived in the apartment. In addition, the police did not know who were the owners or the occupants of the building.

Within minutes of the police entry of apartment no. 3, there came shouts from the first floor that officers had found a number of people in apartment no. 1 at 104 Bellevue Street. Several officers then hurried down to this apartment. The defendant and six other people were found there. In addition, the police searched apartment no. 1, where they seized a .45 caliber handgun underneath a mattress in one of the bedrooms, photographs, five paperfolds, four plastic bags containing white powder and three syringes.

The officer in charge of the crime scene investigation was Detective Brendan Bradley, who was assigned to the homicide unit. Assisting Bradley was Detective Sergeant John Sullivan, assigned to the drug control unit. From the time of the shooting until early the following morning, several officers from the homicide and the drug control units were present in front of 102-104 Bellevue Street and in the building, on the landings, and in various apartments, including apartment no. 3. In addition to the homicide and drug control officers, an officer from Area B in Mattapan, Detective Donald Brown, and an agent from the United States Immigration and Naturalization Service, Agent Paul Jordan, participated in the investigation.

Between approximately 8:30 P.M. and midnight, the officers videotaped the crime scene, looked for "hides" or hiding places, canvassed the building to speak with neighbors, and searched apartment no. 3 at 102 Bellevue Street for bullets shot from across the hall. The police seized items from apartments no. 1 and no. 3 at 104 Bellevue Street as well as from apartment no. 3 at 102 Bellevue Street, the other third-floor apartment.

The identification unit was also called in to examine 102-104 Bellevue Street. Sergeant Robert Ciccolo, and Officers Daniel Sullivan and Robert Silva, assigned to the identification unit, arrived at the crime scene shortly after the shooting. They stayed for approximately one and one-half to two

hours. The officers photographed the third-floor landing and the inside of apartment no. 3. Then the officers collected from the apartment numerous items, found in plain view,[1] to fingerprint in order to determine who had been in the apartment immediately before the shooting. In addition, the officers lifted a latent print on a glass pane in a French door in the apartment. After the officers collected these items they placed them in paper bags and brought them to the identification unit's latent print room at approximately 11 P.M. on February 17, 1988. Other police officers removed the metal door through which the fatal bullet had been fired.

At approximately midnight, several officers left 104 Bellevue Street and went to Area C 11, where they were told to wait until Bradley received a search warrant to return to apartments no. 1 and no. 3 at 104 Bellevue Street. An unknown number of officers remained at 104 Bellevue Street throughout the night.

At approximately 3:30 A.M., on February 18, 1988, Bradley applied for and received a search warrant for apartment no. 3 at 104 Bellevue Street. The search warrant for the apartment authorized Bradley to search for "1) cocaine, 2) marijuana, 3) money, records and paraphernalia related to the possession and distribution of controlled substances, 4) firearms and ammunition, 5) shell casings and spent projectiles, 6) gray metal door with several bullet holes, 7) personal papers to establish identity of the persons [*sic*] or persons in control of the premises."

Sometime close to 4:45 A.M., Detectives Bradley and Sullivan, and other members of the drug control unit, executed the search warrant. According to the return on the search warrant for apartment no. 3 at 104 Bellevue Street, the officers claimed to have seized one metal door and numerous

---

[1]The defendant disputes that all of the items seized by the police were in fact in plain view. He particularly attacks the judge's finding with respect to one item, a tube of foot salve with the defendant's name on it. He argues that the foot salve was in a closed paper bag, and, therefore, that the judge's finding that it was in plain view is erroneous. The view we take of the case makes it unnecessary to consider this issue.

other items including spent shells and one bullet. The judge found, however, that the door, the shells, and the bullet had previously been seized in the earlier search of the apartment.

Based on these findings, the judge concluded (a) that exigent circumstances entitled the police to enter the apartment to make a "protective sweep" to look for Officer Griffiths' killer; and (b) that, having lawfully entered, the police could remain and admit additional officers to seize evidence in plain view, videotape the premises, and lift a latent fingerprint. Without elaborating on the scope or duration of the search after the initial entry, the judge denied suppression, reasoning essentially that the action of the police officers was reasonable in relation to the crime scene as it appeared to them at the time. The defendant argues that the search and seizures exceeded proper constitutional limits under the Fourth Amendment to the United States Constitution and art. 12 of the Declaration of Rights to the Massachusetts Constitution. We conclude that the appeal can be resolved by an application of the fairly strict standards established under the Fourth Amendment by the United States Supreme Court in connection with a protective search immediately following the commission of a violent crime.

"The Fourth Amendment proscribes all unreasonable searches and seizures, and it is a cardinal principle that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment — subject only to a few specifically established and well-delineated exceptions.' " *Mincey* v. *Arizona*, 437 U.S. 385, 390 (1978), quoting *Katz* v. *United States*, 389 U.S. 347, 357 (1967). In the absence of a valid warrant, the Commonwealth has the burden of demonstrating that a warrantless search was justified by exigency, *Commonwealth* v. *Huffman*, 385 Mass. 122, 124 (1982), and "the standards as to exigency are strict." *Id.* at 124-125, and cases cited.

In a murder case, the police "may make a prompt warrantless search of the area to see if there are other victims or if a killer is still on the premises." *Mincey* v. *Arizona, supra*

at 392. *Thompson* v. *Louisiana*, 469 U.S. 17, 21 (1984). The scope of such a search, sometimes characterized as a protective sweep, is limited to a cursory inspection for victims or suspects. Items of possible evidence found in plain view during the course of this limited protective search may be seized. *Mincey* v. *Arizona*, *supra* at 393. However, the United States Supreme Court has refused to expand the scope of a protective search into a general "murder scene" exception which authorizes police to conduct a general investigatory search of a murder scene as thoroughly as if they had obtained a warrant. *Mincey* v. *Arizona*, *supra* at 395. *Thompson* v. *Louisiana*, *supra* at 21-23. These decisions make clear that any warrantless activity is "strictly circumscribed by the exigencies which justify its initiation." *Mincey* v. *Arizona*, *supra* at 393, quoting *Terry* v. *Ohio*, 392 U.S. 1, 25-26 (1968). We illustrate these points by more complete examination of the *Mincey* and *Thompson* decisions.

In *Mincey* v. *Arizona*, *supra*, undercover narcotics agents knocked on the door of an apartment occupied by the defendant. When the door was opened, an officer who had prearranged a sale of heroin slipped inside and moved quickly into the bedroom. The remaining police on entering the apartment heard a volley of shots. The officer who had gone into the bedroom emerged and collapsed on the floor, dying a few hours later.

After the shooting, the police looked around quickly for other victims and rendered emergency medical aid to those who had been injured. The police remained to guard the premises.

Within ten minutes of the shooting, homicide detectives arrived and took charge of the investigation. For four days they searched, photographed, and diagrammed the entire apartment. "The officers opened drawers, closets, and cupboards, and inspected their contents; they emptied clothing pockets; they dug bullet fragments out of the walls and floors; they pulled up sections of the carpet and removed them for examination." *Id.* at 389. No warrant was ever obtained.

In a unanimous opinion, the United States Supreme Court held that the search was unreasonable and could not be justified by any exigency threatening life or limb. "All the persons in [the defendant's] apartment had been located before the investigating homicide officers arrived there and began their search." *Id.* at 393. Nor was there indication of any other exigency. "There was no indication that evidence would be lost, destroyed, or removed during the time required to obtain a search warrant. Indeed, the police guard at the apartment minimized that possibility. And there is no suggestion that a search warrant could not easily and conveniently have been obtained." *Id.* at 394.

In *Thompson* v. *Louisiana, supra* at 21, the United States Supreme Court made clear that "nothing in *Mincey* turned on the length of time taken in the search." In *Thompson,* police responded to a telephone call which reported that the defendant had shot her husband, ingested a quantity of pills in a suicide attempt, and then, changing her mind, telephoned for help. The defendant's daughter admitted police on their arrival at the house and directed them to the rooms containing the defendant and the victim. The police immediately transported the unconscious defendant to a hospital and secured the scene. Thirty-five minutes later, two members of the homicide unit arrived and conducted a follow-up investigation. "The homicide investigators entered the residence and commenced what they described at the motion to suppress hearing as a 'general exploratory search for evidence of a crime.' During the search, which lasted approximately two hours, the detectives examined each room of the house." *Id.* at 18-19.

In *Thompson,* the United States Supreme Court found the search unreasonable under the Fourth Amendment. "Although the homicide investigators . . . may well have had probable cause to search the premises, it is undisputed that they did not obtain a warrant. . . . A 2-hour general search remains a significant intrusion on [a defendant's] privacy and therefore may only be conducted subject to the constraints — including the warrant requirement — of the Fourth

Amendment." *Id.* at 20-21. The Court noted that the exigency ended as soon as the "victim-or-suspect" search had been completed. *Id.* at 22. See *Maryland* v. *Buie*, 110 S. Ct. 1093, 1099 (1990). Subsequent cases that have applied the principles in the *Mincey* and *Thompson* decisions have been careful to uphold only searches and seizures made within the course of the protective search, reemphasizing that any exigency ends with the conclusion of the protective sweep. See, e.g., *United States* v. *Escobar*, 805 F.2d 68, 71 (2d Cir. 1986) ("officers may conduct a security check — a quick and limited pass through the premises to check for third persons — without a warrant when . . . they reasonably fear that other persons are lurking within who may pose a threat to their safety"); *United States* v. *Smith*, 797 F.2d 836, 841 (10th Cir. 1986), quoting *Arkansas* v. *Sanders*, 442 U.S. 753, 760 (1979) ("the few situations in which a search may be conducted in the absence of a warrant have been carefully delineated and . . . we have limited the reach of each exception to [what] is necessary"); *People* v. *Roark*, 643 P.2d 756, 770 (Colo. 1982) ("a warrantless search is strictly circumscribed by the exigency which creates its justification"); *State* v. *Eacret*, 595 P.2d 490, 493 (Or. Ct. App. 1979) ("a warrantless search or seizure is per se constitutionally unreasonable unless justified by exigent circumstances").

In this case, the judge did not make specific findings as to the time of each event on the night of the incident beyond finding that the narcotics officers (Officers Griffiths, Luna, Amate, Schroeder, and Walsh) arrived at about 8 P.M. We can infer that the shooting occurred shortly thereafter. As the judge correctly found, the police were entitled on the basis of exigency to enter the apartment after the shooting to make a protective search in order to apprehend the killer and to find other suspects, and such a search was promptly made by numerous officers of drug control unit squad 6, aided by other available personnel. Apartment no. 3 was empty, but, as the judge found, "[w]ithin minutes of entering Apt. 3, there came shouts from the first floor that the officers had found . . . in Apt. 1 . . . the defendant and six other people."

(Although not mentioned in the judge's findings, the record also indicates that the defendant was arrested and that he was being booked at "[a]pproximately 8:30 p.m.".) The judge did not find when the protective search of apartment no. 3 ended, a critical fact. The evidence establishes, however, that the search lasted for no longer than thirty minutes, concluding, at the latest, at around 8:30 P.M. After the protective search, according to Detective James Farrell, "The place was secure. . . . There was nobody in there." There is also no doubt from the evidence that the members of the homicide and the identification units arrived after the protective search had been completed.[2]

Once on the scene, members of these two investigative units spent three and one-half hours searching and videotaping the entire apartment. As the judge found: "Between approximately 8:30 p.m. and 12 a.m. the officers videotaped the crime scene, looked for 'hides' or hiding places, canvassed the building to speak with neighbors, searched Apt. 3 at 102 Bellevue for bullets shot from across the hall and seized items from Apt. 3 and Apt. 1 at 104 Bellevue Street as well as from Apt. 3 at 102 Bellevue Street, the other third floor apartment." In all over 130 items of possible evidence were seized.

The judge also expressly found that Detective Donald Brown was called in to help with the investigation going on between 8:30 P.M. and midnight. The record indicates that Brown's task was to search for "hides" drawing on his extensive local knowledge. According to Brown, a "hide" is "[a]

---

[2]The judge found that the homicide unit was present at the scene of the incident "from the time of the shooting"; there is no evidence to support this finding. The evidence was that this unit arrived at apartment no. 3 no earlier than 8:30 P.M., and, at any rate, "after a [protective] sweep . . . had already been completed."

The members of the identification unit were present at the scene, according to one part of the judge's findings, "immediately after the shooting," and, according to another part, "shortly after the shooting." The evidence discloses, however, that members of this unit did not arrive until about 9 P.M., and that when they did arrive the homicide unit was already there.

place where either drugs or maybe stolen goods or something like that were stashed inside of an apartment." The three "hides" explored by Brown at 104 Bellevue Street, apartment no. 3, on the night of the incident were a "hide" in the pantry just above some shelves, a "hide" at the top of a closet, and a "hide" under a floorboard behind the bed in the bedroom. During this time, members of the identification unit "went about the scene gathering evidence that [they] thought would be pertinent."

Here, as in the *Mincey* and *Thompson* cases, teams of investigators arrived after a protective search had been completed, remaining on the premises to examine cupboards, probe closets, pry floorboards, dismantle doors, and remove numerous items including a door buzzer plate. Although the judge characterized the over-all situation as a "crime scene investigation," it was in fact and law a general search, conducted after the exigency generated by the need for a prompt protective search had ended, indeed, after the defendant had been arrested.[3] The seizure of the enormous quantity of evidence from apartment no. 3 cannot be justified or excused,[4]

---

[3] The judge relied on *Commonwealth* v. *Young*, 382 Mass. 448 (1981), to support his conclusion. *Young* is distinguishable in that "some of the subjects of observation and test [wet patches of bloodstains], such as liquid on the floors, would not [have been] available indefinitely." *Id.* at 460. There is nothing to indicate in this case that any of the evidence seized by the police would have disappeared or been destroyed. Thus, the exigency of perishable evidence which justified and made lawful the more extended police presence in *Young* is not present here. Further, the *Young* case was decided prior to the decision in *Thompson* v. *Louisiana*, *supra*, which emphasizes the strictness of the time limits in the protective search rule in circumstances like those present in this case.

[4] We reject the Commonwealth's argument that the investigative units could seize items in plain view after the exigency ended because these seizures did not involve an additional search. As a preliminary matter, these seizures *did* involve an additional search. Cf. *Arizona* v. *Hicks*, 480 U.S. 321 (1987). Members of the identification unit "went about the scene gathering evidence that [they] thought would be pertinent," while Detective Brown was probing crevices that could not possibly have been in the plain view of those officers executing the prior protective sweep. The cases cited by the Commonwealth (*Price* v. *United States*, 348 F.2d 68 [D.C. Cir.], cert. denied, 382 U.S. 888 [1965], and *United States* v. *Tuggles*, 334 F. Supp. 383 [E.D. Pa. 1971]), do not support the Commonwealth's

and there is "no suggestion that a search warrant could not easily and conveniently have been obtained." *Mincey* v. *Arizona, supra* at 394. Cf. *Thompson* v. *Louisiana, supra* at 19. In fact, Detective Bradley applied for, and promptly obtained, a valid warrant for 104 Bellevue Street, apartment no. 3, within hours of the incident.

Because nothing was seized during the protective search, it follows that all the items seized from apartment no. 3 during the course of the subsequent warrantless search by the homicide and identification units should have been suppressed. This includes the videotape and photographs of the apartment, the lift of any fingerprints, and the foot salve, since these items of evidence were obtained while the police had no lawful right to be on the premises. See and compare *Commonwealth* v. *Freiberg*, 405 Mass. 282, 299 (1989); *Commonwealth* v. *Helme*, 399 Mass. 298, 303 (1987). Suppression must also include the metal door, the three .45 caliber spent shells, and the one .38 caliber bullet which were listed on the inventory of items seized pursuant to the search warrant obtained at about 3:30 A.M. and executed shortly thereafter, but which, the judge found (with support in the record), actually were seized from apartment no. 3 in the earlier, warrantless search.

The order denying the motion to suppress is vacated, and the case is remanded to the Superior Court where an order is

---

position. The facts here fall squarely within *Mincey* v. *Arizona, supra,* and *Thompson* v. *Louisiana, supra.* Further, as the recent case of *Maryland* v. *Buie*, 110 S. Ct. 1093, 1099 (1990), made clear: "We should emphasize that . . . a protective sweep, aimed at protecting the arresting officers, if justified by the circumstances, is nevertheless not a full search of the premises, but may extend only to a cursory inspection of those spaces where a person may be found. The sweep lasts no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises" (footnote omitted).

We also reject the argument that an inevitable discovery rule should be applied to validate the seizure for the reasons stated in *Commonwealth* v. *O'Connor*, 406 Mass. 112, 118 (1989). See also *United States* v. *Satterfield*, 743 F.2d 827, 846 (11th Cir. 1984).

to be entered allowing the suppression of the items described above. The case may then stand for further proceedings.

*So ordered.*