NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12510

COMMONWEALTH  vs.  JOSE L. ARIAS.


Essex.     September 7, 2018. - March 15, 2019.

Present:  Gants, C.J., Lenk, Gaziano, & Lowy, JJ.


Constitutional Law, Search and seizure, Probable cause.  Search
     and Seizure, Probable cause, Exigent circumstances,
     Emergency, Multiple occupancy building, Protective sweep,
     Plain view.  Probable Cause.  Practice, Criminal, Motion to
     suppress, Interlocutory appeal, Appeal by Commonwealth.
     Evidence, Informer.  Witness, Police informer.  Controlled
     Substances.


Indictments found and returned in the Superior Court
Department on April 14, 2014.

A pretrial motion to suppress evidence was heard by Mary-
Lou Rup, J.

An application for leave to prosecute an interlocutory
appeal was allowed by Hines, J., in the Supreme Judicial Court
for the county of Suffolk, and the appeal was reported by her to
the Appeals Court.  After review by the Appeals Court, the
Supreme Judicial Court granted leave to obtain further appellate
review.


Esther J. Horwich (Stephen J. Wright also present) for the
defendant.
Kenneth E. Steinfield, Assistant District Attorney, for the
Commonwealth.

David R. Rangaviz, Committee for Public Counsel Services, for Committee for Public Counsel Services, amicus curiae, submitted a brief.

GAZIANO, J.  In this case, we confront the scope of two exceptions to the warrant requirement that have resulted in some confusion in previous jurisprudence in the Commonwealth:  the emergency aid exception and the exigent circumstances exception.[1]

1.  Background.  a.  Facts.  We summarize the facts found by the motion judge following an evidentiary hearing on the defendant's motion to suppress, supplemented by uncontroverted and undisputed facts in the record that were implicitly credited by the judge and that do not detract from the judge's ultimate findings.  See Commonwealth v. Jones-Pannell, 472 Mass. 429, 431 (2015).  We reserve some details for later discussion.

On the evening of March 4, 2014, the Lawrence police department received a tip from an unnamed 911 caller.[2]  The caller stated that she was "coming down the street" when she saw two "Spanish guys" "with a gun . . . going up to the building" located at "7 Royal Street" in a residential neighborhood in Lawrence.  The caller stated that "they . . . had a hat on," and

---

[1] We acknowledge the amicus brief submitted by the Committee for Public Counsel Services.

[2] The record does not contain precise times concerning when the 911 call occurred or when officers responded to the scene. Notably, when the officers responded, they were working the "night shift," which began at 5 P.M. and ended at 1 A.M.

were wearing "a jacket and a coat," one of which "was gr[a]y and the other was black."  The caller "heard . . . one of them load the gun," and saw the men enter the building.  The caller said that "there's always a little movement in that building," and acknowledged that she was "not really sure what's going on."  In addition, the caller stated that she was new to the neighborhood, and that she had not seen the men previously.  She provided the dispatcher with her home address, and the dispatcher indicated to the caller that he was aware of the caller's telephone number.

A dispatcher subsequently issued the following report: "Any detective or any available north car [near the specified address], caller said she saw two Hispanic males enter a house, one in a gray jacket, one in a black jacket, the male was loading gun, was loading a cli[p] to a handgun."[3]

The motion judge credited that, during the general period in which the 911 call was made, the Lawrence police department was investigating a "rash" of "home invasions" believed to be the work of a "crew" from New York.  The judge noted, however, that the evidence did not indicate "how recently or where" the home invasions had occurred, or if any home invasion had

---

[3] The judge found that both the 911 caller and the police dispatcher "provided very general descriptions" of the men who entered the building.

"occurred in the immediate vicinity or neighbor[hood] of" the particular street.

Multiple police officers responded to the dispatch. The address given was one of two numbers associated with a four-unit apartment building. The building had a single front door, marked with the number "5" on the right side of the door and the number "7" on the left side of the door. The building contained two apartments on the ground floor, numbered "5A" and "7A," and two apartments on the upper floor, numbered "5B" and "7B." At the rear of the building, there was a porch with two entrances.

Sergeant Michael Simard of the Lawrence police department was the supervising patrol sergeant that evening. He arrived at the scene in a marked cruiser and was wearing a uniform. Simard saw no one outside the building. He and a number of other officers monitored the front entrance.

Sergeant Joseph Cerullo of the Lawrence police department's special operations division arrived at the scene in a marked cruiser; he, too, was wearing a uniform and a badge.[4] Cerullo and four other officers, including two members of the canine unit of the Essex County sheriff's department, moved to the rear of the building.

---

[4] In his role with the special operations division, Sergeant Joseph Cerullo was responsible for emergency responses.

At the front of the building, Simard spoke to residents of unit 7A, the first-floor apartment located across the hall from unit 5A. The residents of unit 7A denied seeing or hearing anything out of the ordinary, and said that they did not know who lived in unit 5A. The residents did describe, however, the "layout of the apartment [at unit 5A] as far as what door leads to where." Simard commented that the residents of unit 7A were scared because of the "[fifteen] police officers with their guns drawn." Simard also stated that, except for the residents of unit 7A, no residents of the building appeared to be at home.

After obtaining the telephone number of the 911 caller, Simard spoke with her by telephone.[5] The caller told Simard that

---

[5] The judge found that the record did not make clear whether Sergeant Michael Simard spoke first to the residents of unit 7A or to the 911 caller. We analyze the judge's findings as to this point based on the record that was before her, and we do not address later-discovered evidence that the judge did not consider. Were we to consider this evidence, it would not change the result we reach.

At the hearing, the parties stipulated to the admission of a compact disc (CD) that contained audio recordings captured on a single audio track. The recordings were of the initial 911 call and the dispatch provided to responding officers. The judge listened to those recordings; she also was provided a copy of a CD that contained only those recordings. In its brief to the Appeals Court, however, the Commonwealth submitted a CD that contained additional audio recordings of police communications that had not been before the motion judge, and that were not transcribed in the filings in the Superior Court or on appeal. In particular, one of the recordings contains a telephone conversation between an employee of the Lawrence police department and the 911 caller that highlights a discrepancy as to when Simard spoke with the 911 caller. The judge made no

she had seen three males whom she did not recognize talking on the front step of the building located at "5-7" on that street. The caller stated that she had heard the sound of a "rack" being pulled back on a semiautomatic handgun,[6] a sound she recognized because she was "from Lawrence." According to Simard, the caller did not see a firearm. The caller was nervous, and was aware of recent armed robberies "in the area." The judge found that the "officers at the scene learned the above-described information within minutes of their arrival."[7]

The caller told Simard that the men likely had a key to the building because they entered the front door "easily." Cerullo

---

findings as to that discrepancy, evidence of which was not before her.

[6] "Racking" a handgun involves pulling the slide back to load a round into the chamber. See Commonwealth v. Arias, 92 Mass. App. Ct. 439, 447 n.9 (2017). Although the officers did not determine whether anyone living in the building was licensed to carry a firearm, the judge credited testimony that a firearms license check would have taken a significant amount of time.

[7] Cerullo testified that he and Simard "convers[ed] back and forth" and that Simard shared information he had learned from the 911 caller. The judge found that "Cerullo and Simard discussed the information." According to Cerullo, Simard's "knowledge from the [911] caller was enough for [Cerullo] to make [his] determination to enter the building" because "[t]he knowledge of one would be the knowledge of all." It does not appear, however, that Simard shared all the information he had learned from the 911 caller. Cerullo testified that he "possibly heard" that there were "three individuals out front" of the building, as the 911 caller ultimately told Simard. He testified also that he was not made aware that those individuals likely had a key to the building. In any event, Simard, not Cerullo, ultimately made the decision to enter unit 5A without a warrant.

acknowledged that he and the other officers did not consider whether the men who allegedly entered the building with a firearm were residents of the building.

At the rear of the building, Cerullo observed a Hispanic male leave the building from the left rear door. The man had facial hair and was "wearing a black and gray sweater." He was identified at the evidentiary hearing as "Wascar Bievenido Guerrero Diaz."

With his firearm drawn, Cerullo shouted, "Lawrence Police. Show me your hands." From the front of the building, Simard was able to hear Cerullo. Diaz appeared "shocked" and "quickly went back inside" the building, "closing the door behind him." Cerullo and another officer attempted to enter the building through the door Diaz had used, but, as the judge determined, they "found it locked."[8] According to Cerullo, the door was associated with apartment "number 5." Cerullo did not specify whether he was referring to apartment 5A, 5B, or both.

Cerullo moved to the front of the building to discuss the situation with Simard, while four officers remained at the rear of the building. Focusing their attention on unit 5A, Cerullo

---

[8] The judge did not find that Diaz locked the door to prevent officers from entering the building.

and Simard made the decision to enter that unit without a warrant.[9]

Within approximately three to eight minutes after police arrived at the scene, Cerullo "entered the front door forcefully," and then led a number of officers through the front door of the building and into unit 5A. Conducting a "protective sweep" for any injured persons and the Hispanic male he had seen earlier at the rear of the building, Cerullo moved through the living room toward the rear of the building. Other officers searched different areas of the apartment. They did not find any people, but they did observe in plain view what appeared to be illegal narcotics, a scale, and plastic bags strewn on the floor. The officers did not seize anything at that point.

At the rear of the apartment, Cerullo encountered a door leading to a hallway outside unit 5A. In the hallway, he saw another door. The officers believed that this was the door that Diaz had used minutes earlier. Cerullo also saw a stairway leading up to unit 5B and down to a basement; a light was on in the basement. After confirming the absence of any people inside unit 5A, Cerullo, other officers, and several canine unit dogs searched the basement; they found and arrested three

---

[9] The judge found that there was no basis for the officers to have focused their attention on unit 5A. In addition, the judge noted that the officers were unaware of anyone who lived in that apartment.

individuals.  They did not search anywhere else in the building for the suspected home invaders.

Based on observations made during the warrantless search of unit 5A, officers obtained a search warrant.  Pursuant to the warrant, they searched unit 5A again and seized items from the apartment.

b.  Procedural history.  The defendant filed a motion to suppress evidence seized pursuant to the warrant, on the ground that the warrant was predicated on observations made during an unconstitutional search.  Following an evidentiary hearing, a Superior Court judge allowed the motion.[10]  The Commonwealth filed a petition seeking leave to pursue an interlocutory appeal, and a single justice of this court allowed the appeal to proceed in the Appeals Court.  In a split decision, a panel of the Appeals Court reversed the motion judge, after concluding that the warrantless search was permissible under the emergency aid doctrine.  See Commonwealth v. Arias, 92 Mass. App. Ct. 439, 449 (2017).  We allowed the defendant's application for further appellate review.

2.  Discussion.  "In reviewing a ruling on a motion to suppress, we accept the judge's subsidiary findings of fact

---

[10] Although the judge allowed the motion to suppress as to the defendant and a codefendant, this appeal pertains only to the defendant.

absent clear error 'but conduct an independent review of [the judge's] ultimate findings and conclusions of law.'" Commonwealth v. Cawthron, 479 Mass. 612, 616 (2018), quoting Commonwealth v. Scott, 440 Mass. 642, 646 (2004).

A "warrantless government search of a home is presumptively unreasonable under the Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights." Commonwealth v. Entwistle, 463 Mass. 205, 213 (2012), cert. denied, 568 U.S. 1129 (2013). See Kentucky v. King, 563 U.S. 452, 459 (2011); Brigham City v. Stuart, 547 U.S. 398, 403 (2006). "The presumption against warrantless searches reflects the importance of the warrant requirement to our democratic society." Commonwealth v. Tyree, 455 Mass. 676, 683 (2010). "Under the exclusionary rule, evidence seized pursuant to an unreasonable search generally will be suppressed." Commonwealth v. Tuschall, 476 Mass. 581, 584 (2017). "Warrantless searches may be justifiable, however, if the circumstances of the search fall within an established exception to the warrant requirement." Id.

a. Emergency aid exception. The emergency aid doctrine establishes one such "narrow exception to the warrant requirement." See Commonwealth v. Duncan, 467 Mass. 746, 754, cert. denied, 135 S. Ct. 224 (2014). The emergency aid exception applies when law enforcement officers enter a dwelling

to provide emergency assistance.  See Commonwealth v. Snell, 428 Mass. 766, 774, cert. denied, 527 U.S. 1010 (1999) (entry is reasonable under emergency aid exception when made "not to gather evidence of criminal activity but rather, because of an emergency, to respond to an immediate need for assistance" [citation omitted]).

To fall within the narrowly construed emergency aid exception, "a warrantless entry and protective sweep must meet two strict requirements."  See Commonwealth v. Peters, 453 Mass. 818, 823 (2009).  First, at the time of entry, there must be an objectively reasonable basis for the officers to believe that an emergency exists.  See Entwistle, 463 Mass. at 213.  Second, after the entry, the conduct of the officers must be reasonable under the circumstances, id. at 216; in other words, the search must not exceed the scope of the emergency.  See Peters, supra. "Where these two conditions have been satisfied, warrantless entry into a home is permissible."  Duncan, 467 Mass. at 751. The "burden rests with the Commonwealth to demonstrate that a warrantless search . . . fits within the emergency aid exception to the warrant requirement."  Entwistle, supra at 215, quoting Peters, supra.  See Snell, 428 Mass. at 774-775.

i.  Objectively reasonable belief.  To meet its burden, the Commonwealth first must demonstrate objectively reasonable grounds to believe that an emergency existed at the time of

entry.  See Peters, 453 Mass. at 823.  See also Hill v. Walsh, 884 F.3d 16, 19 (1st Cir. 2018) (warrantless entry into dwelling requires "objectively reasonable basis for believing" that "immediate aid" is required by someone within [citation omitted]).

In determining whether a warrantless entry is objectively justified, we evaluate it "in relation to the scene as it could appear to the officers at the time, not as it may seem to a scholar after the event with the benefit of leisured retrospective analysis" (citation omitted).  Peters, 453 Mass. at 825.  A reviewing court does not consider officers' subjective motivations in entering a house.  See, e.g., Entwistle, 463 Mass. at 214.  See also Michigan v. Fisher, 558 U.S. 45, 47 (2009).

The reasonableness of an entry is evaluated under the totality of the circumstances.  Compare Tuschall, 476 Mass. at 585-588 (warrantless entry was unreasonable when fumes adversely affected neighbor and her pet, but did not threaten imminent injury, death, or explosion, and there was no indication anyone inside dwelling required emergency assistance), with Commonwealth v. Townsend, 453 Mass. 413, 426 (2009) (warrantless entry was reasonable where dwelling was victim's last known location, her vehicle was parked outside, she had not been seen or heard from in days, and she had missed

scheduled visits with her children and her roommate).  See, e.g., Entwistle, 463 Mass. at 210, 215-216 (warrantless entry was reasonable where victim had not been seen or heard from in days, had uncharacteristically missed multiple appointments with family and friends, and victim's dog could be heard barking inside house); Snell, 428 Mass. at 768-769, 775 (warrantless entry was reasonable where victim's vehicle remained parked outside house for multiple days, victim had not answered multiple telephone calls from her children, and victim had not called to wish her son's wife happy birthday).

Entering officers "do not need ironclad proof of 'a likely serious, life-threatening' injury," Entwistle, 463 Mass. at 214, quoting Fisher, 558 U.S. at 49, in order for a warrantless entry to be reasonable under the circumstances.  In addition, because the entry is made "to prevent harm stemming from a dangerous condition, not to investigate criminal activity," a reviewing court "does not require that police have probable cause that a crime has been committed."  Tuschall, 476 Mass. at 585.  See Duncan, 467 Mass. at 750; Hill, 884 F.3d at 23.  It is sufficient where the totality of the circumstances demonstrates objectively reasonable grounds to believe that emergency assistance is needed to prevent imminent physical harm, to provide assistance to one who is injured, or to protect life or,

in some circumstances, property.[11]  See, e.g., Entwistle, supra at 214, 216.

ii.  Reasonableness of police conduct inside the dwelling. To rely upon the emergency aid doctrine, the Commonwealth also must demonstrate that the conduct of the officers after they entered the premises was reasonable under the circumstances. See Entwistle, 463 Mass. at 216.  To be reasonable, the warrantless conduct of the officers inside the dwelling must be "strictly circumscribed" by the circumstances of the emergency that justified entry.  See Commonwealth v. Lewin (No. 1), 407 Mass. 617, 622 (1990), quoting Mincey v. Arizona, 437 U.S. 385, 393 (1978).  Thus, a protective sweep made pursuant to the emergency aid exception "must be limited in scope to its purpose," Peters, 453 Mass. at 823, e.g., to preventing imminent harm, protecting life or property,[12] or providing aid to one who is injured.

In addition, to be reasonable under the emergency aid doctrine, the officers' conduct after entry "may not be expanded

---

[11] In Michigan v. Tyler, 436 U.S. 499 (1978), the United States Supreme Court addressed a narrow context in which protection of property may support warrantless entry pursuant to the emergency aid exception.  There, the Court held that firefighters who enter a building to extinguish a fire "require[] no warrant, and that once in the building, [they] may remain there for a reasonable time to investigate the cause of the blaze."  Id. at 511.

[12] See note 11, supra.

into a general search for evidence of criminal activity." See Entwistle, 463 Mass. at 217, citing Arizona v. Hicks, 480 U.S. 321, 325 (1987). See also Lewin (No. 1), 407 Mass. at 622. Therefore, if, after entry, officers no longer have an objectively reasonable basis to believe that an emergency exists, it is unreasonable to continue searching. See Mincey, 437 U.S. at 393 (warrantless search was unreasonable when conducted after officers had located all persons in dwelling during prior protective sweep); Commonwealth v. Kaeppeler, 473 Mass. 396, 403 (2015) ("continued police presence in the defendant's home without his consent after he was transported to the hospital for medical treatment and the subsequent seizure of [evidence in plain view] was unreasonable," because emergency concerning "the defendant's well-being had ended," and evidence was seized for "an investigative purpose"); Peters, 453 Mass. at 820 (warrantless search of dwelling was unconstitutional after protective sweep eliminated objectively reasonable basis to believe that emergency existed).

After completing a protective sweep, however, if officers continue to have an objectively reasonable basis to believe that an emergency exists, a subsequent sweep that is limited to the scope of the emergency may be justified. See Entwistle, 463 Mass. at 215-219 (two instances of law enforcement entry coupled with protective sweeps were justified under emergency aid

exception, because each was supported by objectively reasonable bases to believe that emergency existed, and officers' conduct during each sweep was reasonably limited to scope of emergency at hand); Peters, 453 Mass. at 825 ("We do not declare a 'one sweep rule'" . . .).

Undoubtedly, when officers have an objectively reasonable basis to believe that an emergency exists, and they reasonably circumscribe the scope of their conduct after entry, "[e]vidence observed in plain view may be seized," Peters, 453 Mass. at 823, provided that the officers "have not violated the Fourth Amendment in arriving at the spot from which the observation of the evidence is made," King, 563 U.S. at 463; the "incriminating character" of the evidence is "immediately apparent" (citation omitted), Kaeppeler, 473 Mass. at 405; and the evidence actually is in plain view. See, e.g., Hicks, 480 U.S. at 324-325, 328 ("a truly cursory inspection -- one that involves merely looking at what is already exposed to view, without disturbing it -- is not a 'search' for Fourth Amendment purposes," but disturbing or moving objects in plain view constitutes "a 'search'" for which warrant is required); Entwistle, 463 Mass. at 217 (observation of content of printed bill fell within scope of emergency aid exception where "[t]he officer did not open a bill still in its envelope or search for it in a file or drawer; he merely read

what was in plain view from an already opened bill that lay on the kitchen table").

With these considerations in mind, we turn to the search at issue.

iii. Initial search of unit 5A and basement. The defendant maintains that the officers who entered unit 5A and the basement without a warrant lacked objectively reasonable grounds to believe that an emergency existed. The Commonwealth, for its part, acknowledges an "absence of precedent" justifying the officers' warrantless entry under the emergency aid doctrine.

As the motion judge noted, the "Commonwealth's claim that the officers had reason for concern that an armed man was present inside the apartment building is not completely without merit." "[P]olice need not wait for screams from within in order to fear for the safety of occupants or themselves." United States v. Lenoir, 318 F.3d 725, 730 (7th Cir.), cert. denied, 540 U.S. 841 (2003). Entry into unit 5A pursuant to the emergency aid exception, however, required an objectively reasonable basis to believe that an emergency existed. See, e.g., Fisher, 558 U.S. at 47; Tuschall, 476 Mass. at 585. The totality of the circumstances at the time of the entry into unit 5A did not support such a basis.

When the officers arrived at the scene in response to the 911 call, they saw and heard no signs of disturbance, and detected no signs of forced entry. To the contrary, they observed that the doors to the building, and to unit 5A, were closed and intact. Moreover, when Simard spoke with the 911 caller, she said that the men had entered the building "easily," because they likely had a key. The officers interviewed residents of unit 7A and learned that the residents, too, had seen and heard nothing suspicious or out of the ordinary. No one else informed the officers of any commotion, noises, or sounds coming from unit 5A. As the motion judge found, the officers had no knowledge of any residents or victims inside unit 5A, and the only residents of any unit the officers knew were present were the unharmed residents of unit 7A.

The fact that Diaz was observed at the back of the building does not transform the situation into an emergency. There was no indication that he was injured, in need of emergency assistance, armed, or about to harm others, or that he had harmed others.

Regardless of whether the officers had sincerely held beliefs as to the existence of an armed home invasion or hostage situation, their subjective beliefs at the scene cannot justify a search under the emergency aid exception. See, e.g., Stuart, 547 U.S. at 404; Entwistle, 463 Mass. at 214. The totality of

the circumstances at the time of entry here did not establish a reasonable basis to believe that an emergency existed in unit 5A.[13]  See Tuschall, 476 Mass. at 585-587.  Therefore, the warrantless search was not justified under the emergency aid exception.

Our analysis does not end there, however.  We turn to consider whether the entry was justified for some other reason, i.e., under the probable cause and exigent circumstances exception.

b.  Probable cause and exigent circumstances exception. The judge concluded that, under the exigent circumstances doctrine, the facts confronting the officers did not establish the existence of an exigency, or probable cause of an armed home invasion or hostage situation in progress.

Pursuant to both art. 14 and the Fourth Amendment, the exigent circumstances doctrine establishes another "well-recognized," King, 563 U.S. at 460, yet "narrow" exception to the warrant requirement, see Tyree, 455 Mass. at 691.  See also

_____

[13] As to the second prong of the emergency aid exception, the reasonableness of the scope of the search, the judge found that "credible evidence showed that the police conducted only a limited protective sweep."  The defendant argues, however, that the search of the basement was unreasonable, as the officers had found no sign of an emergency in unit 5A.  Because the officers lacked an objectively reasonable basis to believe that an emergency existed anywhere in the building, a protective sweep was unjustifiable under the emergency aid doctrine, regardless of the scope of that sweep.

Commonwealth v. Young, 382 Mass. 448, 456 (1981) ("Exigencies which may justify a procedure without warrant are a narrow category and must be established by the Commonwealth . . ."); Commonwealth v. Forde, 367 Mass. 798, 800 (1975) ("the standards as to exigency are strict").

"In the absence of a warrant, two conditions must be met in order for a nonconsensual entry to be valid" under the exigent circumstances doctrine:  (1) "there must be probable cause" and (2) "there must be exigent circumstances."  Commonwealth v. DeJesus, 439 Mass. 616, 619 (2003).  See Figueroa, 468 Mass. at 211-212.  In this way, "[t]he exigent circumstances exception to the warrant requirement may be more appropriately denominated the exception for probable cause and exigent circumstances" (emphasis in original).  J.A. Grasso, Jr. & C.M. McEvoy, Suppression Matters Under Massachusetts Law § 14-1[a] (2017). See Kirk v. Louisiana, 536 U.S. 635, 638 (2002) (per curiam) ("police officers need either a warrant or probable cause plus exigent circumstances in order to make a lawful entry into a home").  Put differently, when probable cause exists to believe that a crime has occurred, is occurring, or will occur imminently, warrantless entry is justified only if exigent circumstances also are present.  See Figueroa, supra at 213. Conversely, without probable cause, the existence of an exigency

is insufficient to permit warrantless entry into a dwelling.
See id.

The Commonwealth "bears the burden of proof" to establish
that a warrantless search was proper. See Young, 382 Mass. at
456. See also Tyree, 455 Mass. at 684 ("Given the high value
that our Federal and Massachusetts Constitutions assign to the
warrant requirement, particularly in relation to a dwelling, we
impose a heavy burden on the Commonwealth to justify every
warrantless search: in the absence of consent, the Commonwealth
must prove both probable cause to enter the dwelling and the
existence of exigent circumstances" [footnote omitted]).

When entry is lawful under the exigent circumstances
doctrine, "the police, in accordance with the rule of 'plain
view,' [may] take into their possession material having apparent
evidential connection to the criminal activity they were in
course of investigating" (footnote omitted). Young, 382 Mass.
at 458. See, e.g., King, 563 U.S. at 463 ("[i]t is . . . an
essential predicate to any valid warrantless seizure of
incriminating evidence that the officer did not violate the
Fourth Amendment in arriving at the place from which the
evidence could be plainly viewed" [citation omitted]); Forde,
367 Mass. at 807 ("the police had no legal justification for
being present in the apartment and [therefore] cannot rely on

the 'plain view' doctrine for a warrantless seizure of contraband").

We begin with the question of exigency.

i. Exigency. A warrantless entry is justified only if, in addition to the existence of probable cause, exigent circumstances are present. See Figueroa, 468 Mass. at 213. See also King, 563 U.S. at 470 ("Any warrantless entry based on exigent circumstances must, of course, be supported by a genuine exigency"). "[A]bsent exigent circumstances, the firm line at the entrance to the house . . . may not reasonably be crossed without a warrant" (quotations and citation omitted). See Kirk, 536 U.S. at 635.

For exigent circumstances to exist, officers must have "reasonable grounds to believe that obtaining a warrant would be impracticable under the circumstances." Figueroa, 468 Mass. at 213. Impracticability arises in the context of the exigent circumstances doctrine when the delay caused by obtaining a warrant would create "a significant risk" that "the suspect may flee," "evidence may be destroyed," or "the safety of the police or others may be endangered." Id. See Tyree, 455 Mass. at 685-691.

"In determining whether a warrantless search falls within the narrow exception of exigent circumstances, we consider 'the circumstances in their totality' . . . ." (citation omitted).

Figueroa, 468 Mass. at 212.  See King, 563 U.S. at 464.  We review those circumstances objectively.  See Young, 382 Mass. at 456.  Thus, "whether an exigency existed" is a matter "to be evaluated in relation to the scene as it could appear to the officers at the time," not as the scene might appear in hindsight.  Id.  See Figueroa, supra; DeJesus, 439 Mass. at 620 n.3.  The subjective beliefs or motives of an officer form no part of this inquiry.  See King, supra.  See also Commonwealth v. Washington, 449 Mass. 476, 485 (2007).

In the circumstances here, for the same reasons that the officers lacked objectively reasonable grounds to believe that residents of unit 5A were in danger, pursuant to the emergency aid doctrine, the officers lacked a reasonable basis to believe that they or others were at risk of imminent harm, pursuant to the exigent circumstances doctrine.  See Figueroa, 468 Mass. at 213.  At the scene, officers encountered no indications of violence or forced entry.  They were unaware of any resident or victim inside unit 5A.  Indeed, the only residents known to officers, those of unit 7A, were unharmed, and had neither seen nor heard anything suspicious.  In addition, when Diaz was seen at the rear of the building, there was no indication that he, the police, or anyone else was at risk of imminent injury.  We therefore agree with the motion judge that there was "nothing

indicative of an imminent threat of danger to persons inside the building or to the officers."

In addition, because the building was surrounded by officers, there was little risk of a suspect's flight from within.  See Figueroa, 468 Mass. at 213.  Further, the record provides no basis for officers to have believed that evidence of an armed home invasion or hostage situation was at risk of destruction.  See id. at 214.

The investigation of a crime, even a serious crime such as an armed home invasion, does not itself establish an exigency.  See Mincey, 437 U.S. at 394 ("We decline to hold that the seriousness of the offense under investigation itself creates exigent circumstances of the kind that under the Fourth Amendment justify a warrantless search"); id. at 393 ("If the warrantless search of a homicide scene is reasonable, why not the warrantless search of the scene of a rape, a robbery, or a burglary?  No consideration relevant to the Fourth Amendment suggests any point of rational limitation of such a doctrine" [quotation and citation omitted]).

Because officers lacked a reasonable basis to believe that an exigency existed in unit 5A, the warrantless search was impermissible.  See DeJesus, 439 Mass. at 620.  Even had the officers reasonably believed that an exigency existed, for the warrantless entry to be permissible, there also had to be

probable cause that a crime was being committed inside the building.

ii.  Probable cause.  To justify an entry into a dwelling pursuant to the exigent circumstances doctrine, the Commonwealth must demonstrate the existence of probable cause.  See Tyree, 455 Mass. at 684.  "[P]robable cause exists where . . . the facts and circumstances within the knowledge of the police are enough to warrant a prudent person in believing that [an] individual . . . has committed or was committing an offense" (citation omitted).  Washington, 449 Mass. at 481.  Accordingly, "an objective test is used to determine whether probable cause exists."  Commonwealth v. Jewett, 471 Mass. 624, 629 (2015), quoting Commonwealth v. Franco, 419 Mass. 635, 639 (1995).

"In dealing with probable cause . . . we deal with probabilities.  These are not technical; they are . . . practical considerations of everyday life, on which reasonable and prudent [people], not legal technicians, act."  Commonwealth v. Cartright, 478 Mass. 273, 283 (2017), quoting Jewett, 471 Mass. at 629.  "Probable cause does not require . . . that police [have] resolved all their doubts."  Cartright, supra, quoting Commonwealth v. Warren, 418 Mass. 86, 90 (1994).  Rather, probable cause "requires more than mere suspicion but something less than evidence [that would be] sufficient to

[sustain] a conviction." Cartright, supra, quoting Jewett, supra.

A. Informant's tip. Where, as here, police seek to establish probable cause based on an informant's tip, they must show, pursuant to the two-prong Aguilar-Spinelli test, both that the tip is grounded in a basis of knowledge, and that it is reliable. See Commonwealth v. Upton, 394 Mass. 363, 375 (1985). See also Spinelli v. United States, 393 U.S. 410 (1969); Aguilar v. Texas, 378 U.S. 108 (1964); Commonwealth v. Alfonso A., 438 Mass. 372, 374 (2003). With respect to informant tips, "the test for determining probable cause is stricter under art. 14 . . . than under the Fourth Amendment." Upton, supra at 364.

In accordance with the Aguilar-Spinelli test, the Commonwealth first must establish the basis of knowledge underlying an informant's tip. See Alfonso A., 438 Mass. at 374; Upton, 394 Mass. at 375. In general, the basis of knowledge prong is satisfied where the information provided springs from an informant's firsthand observations or knowledge. See Alfonso A., supra. In addition, where an informant's tip is sufficiently detailed, a reviewing court reasonably may infer that the informant had a direct basis of knowledge. Id. at 374-375.

If an informant's basis of knowledge is established, to justify the warrantless entry, the Commonwealth then must

demonstrate that the tip was credible.  See Alfonso A., 438 Mass. at 375; Upton, 394 Mass. at 375.  Although a 911 caller's telephone number may be visible to, or determinable by, the 911 operator, under art. 14, that alone does not demonstrate sufficiently the reliability of a tip.  See, e.g., Commonwealth v. Depiero, 473 Mass. 450, 454-455 (2016) (in context of reasonable suspicion, where showing "less rigorous" than probable cause is permissible, this court was "not inclined . . . to attribute veracity to all 911 callers").  Rather, "[w]hen assessing the reliability of [private individuals] who report apparent violations of the law, we accord more weight to the reliability of those who are identified . . . by name and address," because they are not protected "from the consequences of prevarication that anonymity would afford, and consequently may be subject to charges of filing false reports and risk retaliation" (citations omitted).  Commonwealth v. Cavitt, 460 Mass. 617, 628-629 (2011).  See Depiero, supra at 455 ("The veracity test is more difficult for the Commonwealth to satisfy where . . . the caller was anonymous.  Because the caller was anonymous, there could be no evidence regarding the caller's past reliability or reputation for honesty" [citation omitted]).

At the same time, "[i]t is important to recognize that [private individuals] who report criminal activity justifiably

may be concerned for their own safety if their identity becomes known to the persons subsequently investigated or arrested, and for this reason may wish to remain anonymous." Cavitt, 460 Mass. at 629. Such circumstances "should not stand as an insurmountable impediment to a favorable assessment of [the informant's] reliability" (citation omitted). Id. Therefore, an unidentified informant who nonetheless is "identifiable" by officers, see id., and who is aware that officers are able to identify him or her may receive greater credence than a fully anonymous informant. See, e.g., Depiero, 473 Mass. at 455 ("even if the police are able to recover the telephone number and identity of 911 callers, it proves absolutely nothing unless . . . the anonymous caller was aware of that fact. It is the tipster's belief in anonymity, not its reality, that will control his [or her] behavior" [emphasis in original; quotation and citation omitted]).

In addition, the reliability of a tip may be adduced from the extent to which an informant provides factual details. See Alfonso A., 438 Mass. at 375 ("it is especially important that the tip describe the accused's criminal activity in sufficient detail that the [court] may know that [it] is relying on something more substantial than a casual rumor . . . or an accusation" [citation omitted]). See also Depiero, 473 Mass. at 457 ("details provide a level of corroboration beyond that of

'innocent' or easily obtainable facts"); Alfonso A., supra at 376 ("While . . . detail, by itself, does not ordinarily suffice to establish reliability, . . . it remains a factor in the over-all assessment of the informant's reliability").

Each prong of the Aguilar-Spinelli test "must be separately considered and satisfied or supplemented in some way." Upton, 394 Mass. at 375. If an informant's tip fails to satisfy both prongs, other corroborating evidence, such as independent police corroboration, may be able to "make up for deficiencies in either or both prongs." Id. at 376.

B. Analysis. Our inquiry into the issue of probable cause begins with the 911 call. We are satisfied that the judge's subsidiary findings are substantiated by the record. Although this case presents a close question of probable cause, we conclude, as the judge found, that the circumstances confronting the officers at the scene did not corroborate the caller's tip.

As to the basis of knowledge prong, we note that the 911 caller informed the Lawrence police dispatcher that she saw two men "going up to the building" located at the specified address, and that she heard one of the men load the gun before he and his companion entered the building. Thus, the basis of the 911 caller's firsthand knowledge was apparent from the initial tip itself.

Of course, carrying a firearm is not itself a crime in the Commonwealth.  See, e.g., Commonwealth v. Alvarado, 423 Mass. 266, 269 (1996).  But loading a handgun in public prior to entering a residential building does raise valid concerns about the possibility of imminent criminal conduct.  See Commonwealth v. Haskell, 438 Mass. 790, 793-794 (2003) (under less stringent standard for reasonable suspicion, as compared to standard for probable cause, "the act of publicly loading a handgun is an event that creates a reasonable suspicion that a crime may be about to take place").  Thus, the 911 caller claimed to have seen and heard what could have been criminal activity.

The more difficult question, however, is whether the officers had an adequate basis to conclude that the 911 caller's tip was reliable.  In this regard, the caller provided details adverse to a determination of probable cause.  She commented that the men talked calmly before entering the building, which they entered "easily" because they likely had a key.  In addition, although she said that she had never seen the men before, she acknowledged that she was new to the neighborhood and was unsure of what the men were doing.  The caller also provided details that, due to their conflicting nature, undermined her reliability.  She initially said that two men entered the building, but later told Simard that three men had entered the building.  Of course, the details provided by the

caller constitute an important aspect of our assessment of her reliability.  See Alfonso A., 438 Mass. at 376.  Those details undercut the reliability of her tip.

Despite remaining unnamed, however, the 911 caller did give the dispatcher her home address.  She therefore was aware that officers could identify her.  See Depiero, 473 Mass. at 455.  In addition, police had the ability to trace the 911 call to the caller's telephone number.  Indeed, the dispatcher informed the caller that her telephone was associated with an address in Boston.  And Simard ultimately spoke with the caller by telephone to discuss her observations.  The 911 caller was therefore aware that another important component of her identity was known to officers.  We note, however, that "knowledge of the informant's 'identity' and 'whereabouts,'" are generally "not . . . adequate standing alone to confirm the informant's reliability."  See Alfonso A., 438 Mass. at 376.

As indicated, either prong of the Aguilar-Spinelli test may be supplemented by corroborating evidence.  See, e.g., Upton, 394 Mass. at 375.  See also Depiero, 473 Mass. at 456 ("the Commonwealth can . . . establish a caller's reliability through independent corroboration by police observation or investigation of the details of the information provided by the caller" [quotation and citation omitted]).  Because the details of the 911 caller's tip undermined her reliability, the establishment

of probable cause required independent corroboration.  Here, however, the officers discovered no corroborating evidence of criminal conduct; when they did not, the absence of probable cause became clear.

As discussed supra, Simard knew that the residents of unit 7A were unaware of any suspicious activity in unit 5A. Moreover, he was aware that the men who entered the building did so "easily," and that this was most likely because they had a key.  No witness said that there had been any sound or sign of trouble in unit 5A; and no officer observed any sound or sign of struggle, violence, forced entry, or damaged property.  We agree with the motion judge that "nothing . . . indicated that the men who entered" the building "did not reside there."

The judge also found that Diaz, who had facial hair and left the building dressed in a gray and black sweater, did not match the 911 caller's "very general descriptions of two Hispanic men" who had entered the building, one of whom wore a gray jacket and the other of whom wore a black jacket, and neither of whom had facial hair.  See Commonwealth v. Warren, 475 Mass. 530, 535-536 (2016) ("general description of the perpetrator and his accomplices" as "two black males wearing . . . 'dark clothing,' and one black male wearing a 'red hoodie'" made it unreasonable for police "to target the defendant or any other black male wearing dark clothing as a

suspect").  Except for Diaz's gender and ethnicity, he did not match the 911 caller's general description of the men who had entered the multiunit apartment building earlier that evening. Moreover, while the Commonwealth characterizes Diaz's retreat into the building as evidence of guilt, "evasive conduct in the absence of any other information," id. at 538, is insufficient to support probable cause.

We acknowledge that this case presents a difficult question of probable cause, and that officers are at times required to make split-second decisions to avert violence.  The racking of a firearm in public prior to entering a residential building is indeed a troubling suggestion of possible violent activity.  In the circumstances here, however, given the absence of independent corroborating evidence, the reliability of the 911 caller's testimony was insufficient to establish probable cause under art. 14.

> Order allowing motion to suppress affirmed.

LOWY, J. (concurring).  I agree with the court that "the warrantless search was not justified under the emergency aid exception."  Ante at   .  I also agree that the search was not justified under the probable cause and exigent circumstances exception "[b]ecause officers lacked a reasonable basis to believe that an exigency existed in unit 5A."  Id. at   .  But unlike the court, I am convinced that the officers had probable cause to enter the apartment.

"Reasonableness must be evaluated in relation to the scene as it could appear to the officers at the time, not as it may seem to a scholar after the event with the benefit of leisured retrospective analysis" (quotation omitted).  Commonwealth v. Kaeppeler, 473 Mass. 396, 402-403 (2015), quoting Commonwealth v. Townsend, 453 Mass. 413, 425-426 (2009).  When police act on information from a private citizen, "the Commonwealth must show the basis of knowledge of the source of the information (the basis of knowledge test) and the underlying circumstances demonstrating that the source of the information was credible or the information reliable (veracity test)."  Commonwealth v. Depiero, 473 Mass. 450, 454 (2016), quoting Commonwealth v. Anderson, 461 Mass. 616, 622, cert. denied, 568 U.S. 946 (2012).

Here, the court concedes that "the basis of the 911 caller's firsthand knowledge was apparent from the initial tip itself."  Ante at   .  However, the court then concludes that

the caller's veracity has not been established.  Id. at    .  I disagree.

The court acknowledges that the caller "was aware that officers could identify her" and that Sergeant Michael Simard of the Lawrence police department "ultimately spoke with the caller by telephone to discuss her observations."  Ante at    .  It then concludes that "'knowledge of the informant's "identity" and "whereabouts,"' are generally 'not . . . adequate standing alone to confirm the informant's reliability.'"  Id., quoting Commonwealth v. Alfonso A., 438 Mass. 372, 376 (2003).  But this is not a situation in which the police merely knew the informant's identity.  Nor is it a situation in which the informant knew theoretically that the police had the ability to contact her by telephone.  Cf. Commonwealth v. Costa, 448 Mass. 510, 517 (2007) (reliability of caller who knew "that her call was being recorded, and that the number she was calling from had been identified, . . . should have been accorded greater weight than that of an anonymous informant").  Here, police did contact the informant by telephone, and the informant responded by continuing to cooperate and by providing significant additional information.  The caller also used a technical term, "racking," to describe what she heard, and she explained that she was familiar with the sound because of personal experience.  See

Alfonso A., supra (use of detail "remains a factor in the over-all assessment of the informant's reliability").[1]

This reliable informant told police that she had observed two men with a gun enter a building at a specified address, and she claimed to have heard one of the men load a gun.[2] It is unusual for an individual to load a gun on the threshold of a private residence. To do so in broad daylight accompanied by another individual only increases the unlikeliness that the firearm was being loaded for innocent purposes. As the court correctly observes, "loading a handgun in public prior to entering a residential building . . . raise[s] valid concerns

---

[1] I assume for purposes of my analysis, as does the court, that the conversation Sergeant Michael Simard of the Lawrence police department had with the caller took place before the officers entered the apartment. A recording with which we were provided, but to which the motion judge did not have access, suggests that this conversation might have occurred after the warrantless entry. See ante at note 5.

[2] The court states that, "[a]ccording to Simard, the caller did not see a firearm." Ante at    . But according to the motion judge's factual findings, which we must accept unless clearly erroneous, "[t]he caller reported that while coming down her street she observed 'two guys with a gun' at 7 Royal Street." That finding was not clearly erroneous. Although Simard testified that the caller never said she had observed a gun, Sergeant Joseph Cerullo of the Lawrence police department testified that the caller did say she had observed a gun. The motion judge was free to credit Cerullo's testimony over that of Simard. Moreover, the 911 recording, which was played in open court, confirms that the caller said, "I seen two guys with a gun."

about the possibility of imminent criminal conduct." Ante at .

In addition to having reliable information from the caller that a gun was being loaded in public, the police also knew about an ongoing investigation into home invasions in Lawrence. And when they reached the address that the caller named, a man emerged from the building, only to retreat inside when an officer with a drawn gun told him to show his hands. The police tried to open the door that the man had reentered, but it was locked. There are many reasons why an individual might flee in the presence of the police. See Commonwealth v. Warren, 475 Mass. 530, 540 (2016) (observing that black male, "when approached by the police, might just as easily be motivated by the desire to avoid the recurring indignity of being racially profiled as by the desire to hide criminal activity"). Nonetheless, it would seem to be an unusual occurrence when a person who is told by a police officer with a drawn weapon to show his hands ignores the command and reenters a residence, locking the door behind him. The fleeing man here, combined with the tip that a gun was being loaded in public and the knowledge of prior home invasions, gave the police probable cause.[3]

---

[3] That the caller believed the men had a key to the premises does not alter my conclusion. It is not unusual for a crime in

For the foregoing reasons, I concur.

---

a home to be perpetrated by individuals who know the victims or have a means peaceably to enter the premises. See Commonwealth v. Middlemiss, 465 Mass. 627, 629 (2013) (defendant entered residence with key); Commonwealth v. Morgan, 460 Mass. 277, 285 (2011) (same). See also Commonwealth v. Phap Buth, 480 Mass. 113, 114, cert. denied, 139 S. Ct. 607 (2018) (defendant, who had previously bought drugs from resident, entered when resident opened door for him); Commonwealth v. Doucette, 430 Mass. 461, 462-463 (1999) (defendant, who had been resident's friend, entered through unlocked door).